No. 22886.

Roger Fellhauer v. People of the State of Colorado, The Amity Mutual Irrigation Company, C.F.&I. Steel Corporation, The Canon City Hydraulic and Irrigating Ditch Company and the Bessemer Irrigation Ditch Company.
(447 P.2d 986)

Decided November 25, 1968. Rehearing denied January 6, 1969.

DAVIS, GRAHAM & STUBBS, JOHN M. SAYRE, CLYDE O. MARTZ, WILLIAM A. HILLHOUSE II, REXFORD L. MITCHELL, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JAMES D. GEISSINGER, Assistant, BEN L. WRIGHT, JR., Special Assistant, for defendant in error People of the State of Colorado.

GLEN G. SAUNDERS, for all intervenors, The Amity Mutual Irrigation Company, C.F.&.I. Steel Corporation, The Canon City Hydraulic and Irrigating Ditch Company, and the Bessemer Irrigation Ditch Company.

DON H. SHERWOOD, GARY L. GREER OF DAWSON, NAGEL, SHERMAN & HOWARD, for amici curiae Frank C. Mann, Cornelius G. Cozart, City of Fort Morgan, Colorado, The American National Bank of Denver, Trustee.

GEORGE A. EPPERSON, DONALD F. McCLARY, STANLEY I. ROSENER, GEORGE C. TWOMBLY, EARL HAFFKE, DOYLE T. JOHNS, JR., C. H. ANDERSON, for amici curiae Bijou Irrigation Company, Bijou Irrigation District, Deuel & Snyder Ditch Company, Fort Morgan Reservoir & Irrigation Company, Jackson Lake Reservoir & Irrigation

Co., Johnson and Edwards Ditch Co., Lower Platte & Beaver Canal Company, Riverside Irrigation District, Riverside Reservoir & Land Co., Upper Platte & Beaver Canal Company, Tremont Ditch Company, Smith & Snyder Ditch Co., Union Mutual Ditch, Tetsel Ditch Company.

KREAGER, SUBLETT AND DOWIS, BEN D. SUBLETT, PETER C. DIETZE, ROBERT W. GIACOMINI, BRYAN MORGAN, GEORGE L. ZOELLNER, for amici curiae of Owners of Senior Water Rights.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

ACTION was brought by the Attorney General on behalf of the People of the State of Colorado under 1965 Perm. Supp., C.R.S. 1963, 148-11-22, to enjoin the plaintiff in error from pumping and using water from the alluvium of the Arkansas River contrary to an order of the water division engineer. The other defendants in error intervened to support the constitutionality of this statute, herein referred to as the 1965 act. We have had the benefit of three briefs *amici curiae*, representing different views, from fourteen attorneys in Boulder, Brush, Denver, Fort Morgan and Sterling.

The People will be referred to as plaintiff and the plaintiff in error as defendant.

The defendant's well is located approximately 30 to 35 miles below Pueblo and about the same distance above La Junta. It was drilled in 1935 to a depth of about 35 feet. When drilled the well was about a quarter of a mile from the bank of the river but the channel of the river has since changed and, at the time of the division engineer's order and at the time of trial, the bank was approximately 400 feet from the well. The well's bottom is approximately 20 feet below the bed of

the river projected laterally. Since 1935 the defendant and his predecessor have pumped 800 gallons of water per minute continuously during each irrigation season of 150 to 180 days. This has been defendant's primary supply of water for irrigation of about 150 acres of land.

The priority right of this well has not been adjudicated. On June 24, 1966 there was not sufficient water in the river to fill the adjudicated rights of downstream users having priority dates as early as 1887; and they desired more water. On that date the division engineer notified the defendant to cease pumping until further notice. The defendant, asserting that the 1965 act was unconstitutional, refused to comply with the order. The action was then commenced and after hearing the court first issued a preliminary restraining order, prohibiting defendant from pumping water. Later, after hearing testimony and argument for five more days, it issued a permanent injunction as to the pumping "except in accordance with its right of priority of appropriation as determined from time to time, pursuant to the law of Colorado, including C.R.S. 148-11-22; or until further order of this court." The defendant has asked our review of these injunctive orders and the proceedings upon which they were based.

All of the surface flow in the Arkansas River during each irrigation season had been appropriated and placed to a beneficial use long before defendant's well was drilled in 1935. These surface appropriations have adjudicated priority rights and there is not enough surface water in the river to satisfy these decreed rights. In other words, the Arkansas River is very much over-appropriated. On June 24, 1966 the Fort Lyon Canal, whose head gate is about 33 miles downstream from defendant's well, was receiving only 272 cubic feet of water per second of time of the 760 second feet decreed to it with priority date of March 1, 1887, and six days later there was no water whatsoever for its use.

*The River and Its Alluvium*

The home of the river involved, the Arkansas Valley, extends 340 miles from Leadville to the Kansas line. During the millions of years of its history the river has cut into and eroded away the formations, principally shales, over which it has flowed. Through long passages of time its course has changed back and forth. The result has been the creation of a trough filled with sand and gravel over a portion of which the river flows. With some simplification, it may be said that this body of sand and gravel, filled with slowly moving water, is the alluvium.

The alluvium is of varying widths and depths. At one point it was shown to be 3.4 miles wide, and at another 1.84 miles. In one area the depth of this sand and gravel is 34 feet, and in another 20 feet. The testimony was that between Pueblo and the Kansas line, a distance of 150 miles, it contains around 1,900,000 acre-feet of ground water. This water moves at the rate of 3 to 5 feet each 24 hours. As is the case of the surface water, it flows downstream. However, it also tends to flow toward the stream from each side, the extent of this being dependent upon proximity to the river, grade, geological conditions and other factors.

This slowly moving underground body of water has its source principally from precipitation and irrigation. The alluvium water drains to the visible stream in places and, if a well causes the level of the underground water to be lower than that of the surface stream, the latter will drain into the former with consequent loss to the surface flow.

*The 1965 Act*

The 1965 act reads as follows:

"State engineer to administer water laws.

"(1) The state engineer or his duly authorized representative shall execute and administer the laws of the state relative to the distribution of the surface waters of the state including the underground waters tributary

thereto in accordance with the right of priority of appropriation, and he shall adopt such rules and regulations and issue such orders as are necessary for the performance of the foregoing duties.

"(2) In the event an order with respect to the distribution of water is not complied with, the state engineer, in the name of the people of the state of Colorado through the attorney general of the state, may apply for an injunction in any court of competent jurisdiction, to enjoin any person, firm, association, partnership, or corporation from diverting the waters described in subsection (1) of this section by means of any ditch, canal, flume, reservoir, pipeline, conduit, well, or other structure, when necessary to prevent such diversion from materially injuring the vested rights of other appropriators. In determining whether or not the vested rights of other appropriators are materially injured by any well, or replacement thereof, there shall be a rebuttable presumption that there is no injury if a well or its replacement was both in existence prior to date of this section, and used continuously since that date, and is not located in the subsurface channel of a continuously flowing surface stream. If it is established that the defendant has been or is diverting waters to the injury of vested rights of other appropriators, the court shall enter a decree enjoining said defendant from further diverting such waters until such time as the state engineer shall find that water is available to the defendant without injury to other appropriators. Any interested party may intervene in such injunctive proceedings; provided, that such intervention is timely and will not cause undue delay. In case of a violation of any injunction issued under the provisions of this subsection (2) the court, or any judge thereof, may try and punish the offender for contempt of court. Such injunctive proceedings shall be in addition to, and not in lieu of, any other penalties and remedies provided by law.

"(3) It shall be unlawful for any person, firm, partner-

ship, association, or corporation to divert waters from a stream or water tributary thereto when there is insufficient water available from such sources to supply the rights of senior appropriators at their point or points of diversion and to the extent of their decrees, and after having received written notice to that effect from the state engineer or his duly authorized representative. Any violation of this section shall be deemed a misdemeanor and punishable by a fine of not less than 100 dollars nor more than five hundred dollars, or by imprisonment in the county jail for not less than ten days nor more than ninety days, or by both such fine and imprisonment." 1965 Perm. Supp., C.R.S. 1963, 148-11-22.

The Attorney General and the intervenors took the position that any acts of the division engineer might well have been under powers delegated under statutes existing prior to the passage of the 1965 act. Without necessarily endorsing the remarks, we find (outside the record and arguments) at pages 1-8, Proceedings of the Joint Session Mineral Law and Water Law Sections, Colorado Bar Association, October 15, 1966, the following statement of Mr. Benjamin F. Stapleton, Jr., the chairman of the Colorado Water Conservation Board:

"* * * House Bill 1066 [the 1965 act], merely gave the State Engineer the right to shut down wells. House Bill 1066 was, in my opinion, superfluous since the State Engineer had not only the right but the responsibility under then-existing laws to shut down wells which were interfering with the prior rights of other water users. The State Engineer insisted that he had no authority and to force the State Engineer to take action on these matters existing laws were amended to make what was already crystal clear even more self-evident by specific command to the State Engineer to take action against well owners in the operation and management of the total water resources of the state.

\* \* \*

"I have always believed that the State Engineer had the

authority to shut down wells if they were interfering with the rights of senior appropriators and yet, because shutting down of a well is always controversial, no action was taken by the State Engineer, acting on the excuse that he had no authority under state laws." * * * We think it not necessary to this opinion to delineate the powers, if any, granted by the 1965 act which had not been granted by existing statutes.

*Injunction Not Predicated on Administrative Order*

 In its conclusions of law the trial court stated: "The legislative intent is plain. The legislature under paragraph 2 provided that if an order of the state engineer is not complied with, an injunction will lie." The defendant rightly contends that the 1965 act does not call for judicial enforcement of administrative orders as a matter of course. We find no disagreement with this contention in any of the briefs. Throughout the proceedings in the district court the Attorney General assumed the burden of attempting to prove that restriction of the defendant's well was (a) necessary to prevent (b) material injury to (c) vested rights of (d) senior appropriators. The findings and other conclusions of law of the trial court are consistent with the proposition that these factors were issues in the case.

*Specific Injury*

 The defendant has urged most strongly and repeatedly that the plaintiff did not prove that the withdrawal and use of water injured any particular senior appropriator and no particular senior user made a call for the water taken by defendant. Therefore, the defendant contends, there is no basis for the injunction. The defendant maintains that the 1965 act must be enforced on a case by case basis, *i.e.*, injury by a particular well to a particular prior surface right. However, we hold that, whenever a court or water administration official can make a finding that the pumping of a junior well materially injures senior appropriators who are

calling generally for more water, there exists a legitimate and constitutional ground and reason for the regulation of the well, and a showing of a call against that well by a particular senior user is not necessary. In other words, we hold that, subject to the conditions hereinafter mentioned, the State Assembly may under proper channels of authority delegate to the water officials the power to protect the stream against unreasonable injury by junior wells when lower senior appropriators are not receiving, but are in need of and asking for their decreed rights.

### Criminal Aspects

The defendant urged that the 1965 act was unconstitutional as it delegates to the state engineer the power to define crime. As to this, we agree with the trial court which disposed of the matter in its conclusions of law as follows:

"The Court does not feel that the criminal aspects of C.R.S. 148-11-22 are before the Court in this case as no crime is being alleged in the Complaint. Further, if the criminal aspect of the statute is invalid, the Court feels that the statute would be severable as later discussed.

"The statute before us, namely 148-11-22, clearly defines what the State Engineer must do, namely, enforce the water laws of the State of Colorado. This only prevents the defendant from taking water that belongs to others.

"It is stated in *Rinn v. Bedford,* 102 Colo. 175, 84 P.2d 827:

'No person is entitled to assail the constitutionality of the statute except as he himself is adversely affected.'

"In the instant case the People are not trying to enforce the criminal provision of C.R.S. 148-11-22 but merely to obtain injunctive relief. This Court feels that *Rinn v. Bedford, supra,* would govern in the instant case that the issue of unconstitutionality of criminal provisions could not be raised.

"The Court feels that, to raise a constitutional issue, the individual must be directly affected, and even if this were not the case the statute would be separable as to injunctive relief and criminal prosecution. *Colorado Anti-Discrimination Commission v. Case,* 151 Colo. 235, 380 P.2d 34."

## Unconstitutional Performance

We now pass to the matter of validity of the acts of the division engineer and, first, to some of the background involved. When the defendant's well was drilled in 1935 there had been little tapping of the underground flow of the Arkansas Valley. In 1940 only 2,000 acre feet were being pumped from wells in the Arkansas Valley. Then came the drilling of wells on a vastly larger scale, being possible because electricity had been made available. By 1964 between 230,000 and 240,000 acre feet of water were being pumped annually from wells in this valley between Pueblo and the state line. By 1966 there were between 1,600 and 1,900 wells in the Arkansas Valley, each of which was pumping in excess of 100 gallons per minute, and in addition there was a large but unknown number of smaller wells. It is believed that one million acre feet can be pumped economically from the alluvium of this valley from Pueblo to the Kansas line. While irrigation above the peripheral alluvium has increased substantially the amount of ground water, it is implicit in the trial court's findings and supported by evidence that the removal of ground water through wells, mostly unadjudicated, has materially and injuriously affected senior decreed rights. It certainly must follow that, if the amount of water pumped increases three or fourfold, further injury will result to senior users.

When water is pumped from a well a cone of depression is formed, *i.e.,* a conical drained area in which the point of the inverted cone is at the bottom of the well pipe. This causes surrounding water in the aquifer to flow into the cone from all sides. Except for wells

in very close proximity of the surface stream, the effect of this diversion upon the visible stream is not immediate. The time that the stream begins to be affected and the extent of the effect in quantity of water and duration depends upon a number of factors, including (a) distance of the well from the stream, (b) transmissibility of the aquifer, (c) depth of the well, (d) time and volume of pumping, and (e) return flow characteristics. A well in or at the bank of the stream may have substantially the same effect as a surface diversion at that point. The effect of a well, which is a considerable distance from a stream and which is used for irrigation, may not take place until the nonirrigation season, and, by the next irrigation season, the conical depression at the well may be completely recharged with new water entering the alluvium.

The testimony was in conflict as to the amount of consumptive use of water from the defendant's well, *i.e.*, the amount lost by evaporation and transpiration. The surface of defendant's lands, being near the river and over the alluvium, all water not consumptively used returned to the stream or the aquifer. There was no testimony as to the movement of this return flow water. One expert testified as to a hypothetical well at Pueblo located 400 feet from the stream, "The well that close to the river will affect the stream to some extent in ten days or possibly less." Except for this we have been unable to find any testimony as to the extent and time of effect of defendant's well upon the stream.

With this background we now can review the method of procedure of the division engineer. He concluded to act without any written rules or regulations and without any prescribed guidelines.

While the water commissioners acting under him submitted reports on diversions, he never required well diversions to be included in reports. He prohibited them from acting and gave them no general instructions, stating, "* * * the only general instructions I have given

them is that they don't know what they are doing, they had better not attempt to regulate wells, because this is something that a nonprofessional should not get involved with on our initial program." Throughout his testimony when the division engineer used the term "regulate wells," he meant "shut down wells." Of the 13 water districts under his jurisdiction he acted only in 2. In these he ordered 39 wells to cease pumping. This action was taken by him under an oral "consensus agreement" with certain senior appropriators (mostly ditch companies) to the effect that he would turn off some wells between May 1 and September 15 and they would not call for water taken by the wells from September 15 to May 1. He went to each of the 39 wells and reached a conclusion as to whether it should be shut down. While he stated that he considered a number of factors, he refused to give the relative weight given to any of them or to show that any standards of evaluation applied to one well were applied to any other.

█ The division engineer testified that all of the 1,600 to 1,900 wells pumping more than 100 gallons per minute affected the stream, but he shut down only 39 of them. He expressed his reasons for this as follows:

"* * * most of the wells in the valley are tributary, but we don't want to arbitrarily shut off all of these wells because you are going to affect the economy of the valley.

* * *

"The only municipal wells that, or attempt was made to regulate, I think related back to 1965 to the City of Lamar and their wells. This is a situation that we certainly can't just arbitrarily go in and shut off the water supply for a town. Most of the towns have been advised that regulations are coming and they have been advised again that it's time to start putting their house in order." While no doubt he acted conscientiously and in good faith, the unsound foundation for his conduct is well illustrated in this question to him and his answer:

"Q. How do you distinguish between the 39 wells you have regulated and the 16 to 1900 or 2000, by your testimony today, wells that you have not, within the subsurface channel?

"A. You might say that the distinguishment is based upon the recognition of the fact by the senior appropriators of the valley that the well economy is an important part of the economy of the valley. And based upon the plan that was presented to the representatives of the senior appropriators, that has been the basis upon which our regulation has been carried out."

In his attempted enforcement of the 1965 act, he proceeded discriminatorily in violation of the equal protection clause of the fourteenth amendment of the United States Constitution and of the due process clause in article II, section 25 of the Colorado constitution.

 Regulation of wells in the Arkansas Valley as contemplated by the 1965 act, in order to be valid and constitutional, must comply with the following three requirements:

(1) The regulation must be under and in compliance with reasonable rules, regulations, standards and a plan established by the state engineer prior to the issuance of the regulative orders.

(2) Reasonable lessening of material injury to senior rights must be accomplished by the regulation of the wells.

(3) If by placing conditions upon the use of a well, or upon its owner, some or all of its water can be placed to a beneficial use by the owner without material injury to senior users, such conditions should be made.

There is a temptation to be more definitive as to these requirements, but in doing so we would be usurping legislative and executive functions. We must confine ourselves to a few rulings on constitutionality and to only broad statements as to any possible future legislation and administration.

The first requirement mentioned above will prevent

arbitrary and discriminatory action of the division engineer in attempting to shut down only 39 of more than 1,600 major wells; of erroneously making his guideline an agreement with certain senior users; of attempting to protect the economy of the valley without plan; and of discriminating unreasonably between wells.

The second requirement perhaps is self-explanatory.

We give an illustration concerning the third requirement. The possibility has occurred to us that, if the defendant would discharge a certain portion of the well water into the stream and use the remainder for the irrigation of his land, no material injury to senior users would result. If so, his pumping could be made conditional upon his discharge of that portion into the stream. This possibility has not been discussed in the evidence nor in the briefs. If it is not a sound thought as to defendant's well, it may be with respect to other wells. The division engineer permitted another well owner to continue pumping on condition that the owner purchase other water for the stream (in an amount not shown in the record). This demonstrates that the division engineer gives some measure of approval to the third requirement.

 For nearly a century the waters of the Arkansas River have been used and reused many times over as they proceed from elevations exceeding 12,000 feet to 3,375 feet at the state line. These uses, and similar uses on other rivers, have developed under article XVI, section 6 of the Colorado constitution which contains *inter alia* two provisions:

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using water for the same purpose;"

Under those provisions and the statutes enacted thereunder a great body of law has been established. In the six briefs, all ably written, sixty Colorado cases have been cited. These decisions are concerned primarily with

the respective priorities of *vested rights* which have been established. It is implicit in these constitutional provisions that, along with *vested rights*, there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights*. We have known for a long time that the doctrine was lurking in the backstage shadows as a result of the accepted, though oft violated, principle that the right to water does not give the right to waste it.

 *Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552, might be called the signal that the curtain was about to rise. There it was stated as follows:

"At his own point of diversion on a natural water course, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole or a substantial flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled. *Schodde v. Twin Falls Land & Water Co.,* 224 U.S. 107, 119, 32 S.C. 470, 56 L. Ed. 686. This principle applied to diversion of underflow or underground water means that priority of appropriation does not give a right to an inefficient means of diversion, such as a well which reaches to such a shallow depth into the available water supply that a shortage would occur to such senior even though diversion by others did not deplete the stream below, where there would be an adequate supply for the senior's lawful demand."

\* \* \*

"A determination of these questions is necessary. The court must determine what, if anything, the plaintiffs should be required to do to make more efficient the facilities at their point of diversion, due regard being given to the purposes for which the appropriation had been made, and the 'economic reach' of plaintiffs. The

plaintiffs cannot reasonably 'command the whole' source of supply merely to facilitate the taking by them of the fraction of the entire flow to which their senior appropriation entitled them. On the other hand, plaintiffs cannot be required to improve their extraction facilities beyond their economic reach, upon a consideration of all the factors involved."

## Matters Not Decided

The more we have perused the testimony and the briefs, the more we have been impressed with the fact that in dealing with the ground waters of the Arkansas Valley and the many complexities involved, intelligent administration requires the collection of further information and the further analysis of information already collected. This is one of the reasons why we have refrained from ruling at this time upon issues which were presented and which involve the following four matters:

1. Whether the term "subsurface channel" is sufficiently definite.

2. Establishment of priorities to unadjudicated wells.

3. The right to uplift.

4. The duty of a senior user to pump in order to satisfy his surface decree.

## Subsurface Channel

The defendant urged that the term "subsurface channel" is so vague and indefinite that it renders the 1965 act unconstitutional. This term appears in the following provision of the act:

"* * * In determining whether or not the vested rights of other appropriators are materially injured by any well, or replacement thereof, there shall be a rebuttable presumption that there is no injury if a well or its replacement was both in existence prior to the date of this act, and used continuously since that date, and is not located in the subsurface channel of a continuously flowing surface stream."

Generally, "subsurface channel" must mean

the portion of the alluvium underlying and adjacent to the surface channel. One geologist and hydrologist defined it as the portion of the saturated valley fill hydrologically connected with the surface stream. He and other experts testified in effect that the entire alluvium is hydrologically connected with the surface stream. One of these experts on an aerial photograph of the area of defendant's well pointed to the tonal changes which in his opinion indicated the edges of the subsurface channel. As we interpret his testimony the subsurface channel does not embrace all of the alluvium and particularly does not include flanking areas of the trough, which are gravel underladen benches and terraces and which in the following paragraph are called the peripheral alluvium.

There was agreement among the parties that water in the alluvium provides or portions thereof provide hydrostatic pressure to support surface flow of the river. To express this in a most nontechnical manner, one might say that the surface flow of the river rides piggyback on the subsurface flow. Perhaps it is the sides of papa in the piggyback operation which represent the boundaries of the subsurface channel as distinct from the sides of the room in which papa and child are playing, but we do not know. It may be that "subsurface channel" embraces the entire alluvial fill of the valley. On the other hand the flow of water in the valley might be characterized — as Gaul — as having three parts: (1) the surface flow; (2) the flow in the subsurface underlying and adjacent to the surface stream, which portion of the subsurface we might visualize as the supporting alluvium and as the "subsurface channel"; and (3) the flow in the remainder of the alluvium which might be called the peripheral alluvium, being the outlying portions whose surface constitutes the benches and terraces.

All of the expert witnesses either testified that the Fellhauer well was within the subsurface

channel of the river or seemed to assume that it was. We are satisfied that it was within the "subsurface channel" of the stream under any definition of the term. Fellhauer could not possibly be entitled to the benefit of any presumption which the legislature attempted to create in favor of a person whose well was located at a point outside of the "subsurface channel." Assuming, without deciding, that the term is so vague and indefinite as to be without any force or effect, Fellhauer is in no position to raise the question. The use of the term in the statute does not deprive him of any right and confers none upon him.

If the term "subsurface channel" in itself is sufficiently precise for those acting under the legislation to determine the boundaries thereof in each stream bed, there is little question but what the state engineer must have in his plan or rules and regulations a definition or description of the areas to be encompassed thereby in a particular stream or portions thereof.

With our lack of disposition of the issue concerning "subsurface channel," a portion of our remarks under this heading is *gratis dicta*. These comments have been made as all parties and amici have indicated that we should go as far as it was thought feasible in the evaluation of the 1965 act and its administration.

*Establishment of Priorities to Unadjudicated Wells*

The 1965 act states that the state engineer shall administer waters, including tributary underground waters "in accordance with the right of priority of appropriation." Most of the underground waters of the Arkansas Valley have not been adjudicated. Between 1957 when the statute was adopted and 1965 when it was repealed, ground-water users of this state were legislatively told that it was not necessary to adjudicate their wells: "The priority date of a ground water appropriation shall not be postponed to a time later than its true date of initiation by reason of failure to adjudicate such right in a

surface water adjudication." C.R.S. 1963, 148-18-9, repealed by 1965 Perm. Supp., C.R.S. 1963, 148-18. The same legislative statement again came into being in 1967. 1967 Perm. Supp., C.R.S. 1963, 148-2-11. In contrast to the wording of the 1965 act, a much older statute, unrepealed, states:

"For the purpose of hearing, adjudicating and settling all questions concerning the priority of appropriation of water between owners and claimants of water rights drawing water from the same source within the same water district, and all other questions of law and questions of right growing out of, or in any way involved or connected therewith, jurisdiction is hereby vested exclusively in the district court of the county in which said water district exists * * *." C.R.S. 1963 148-9-2.

The division engineer answered a question as follows:

"Q. As between unadjudicated wells, do you give any consideration whatsoever to the dates of first use in determining whether or not to regulate one well rather than another?

"A. Absolutely not. Our office is an administrative rather than judicial."

The defendant has asserted that the 1965 act unconstitutionally delegates judicial powers to the state engineer and, somewhat paradoxically, that the state engineer (acting through the division engineer) acted in violation of the Colorado constitution and the 1965 act in not determining priorities of unadjudicated wells and first shutting down those with the least priority. The trial court disposed of the matter as follows:

"Further, the rights of defendant are so junior to the senior rights affected that no consideration needed to be given to their date of priority, as priorities many years senior to defendant's rights whether adjudicated or not are almost constantly curtailed."

In this connection we think it well to quote a portion from the following significant law review article —

Morgan, *Appropriation and Colorado's Ground Water: A Continuing Dilemma?*, 40 U. Colo. L. Rev. 133 (1967) (footnotes omitted):

"The Colorado system of appropriation was tailored to the conditions of surface stream diversions in an arid western climate. \* \* \*

"\* \* \* such factors as well size, the transmissibility and saturated thickness of an aquifer, and the spacing of wells did not complicate the century-old problems for which the doctrine was designed. Wells junior in time are frequently scattered at indiscriminate distances and bear random priorities. Although wells closest to a senior diversion frequently will have the greatest impact, appropriation rules look exclusively to seniority, disregarding the all-important factors of proximity and actual effect. As a result, the first wells called upon to stop pumping must be the most junior wells, even though they may be geographically the most distant and the least offensive to the senior. Strict administration on the basis of seniority would plainly 'prevent a full beneficial use of water' in the aquifer.

"Because of these complexities, the need for detailed engineering data on well size, location, operation, priority and anticipated effects is essential to an effective application of the appropriation theory to well operations. Wells which number in the thousands cannot be governed by priority where priorities are unknown. Futile calls on distant or even proximate diversions are unavoidable without a precise understanding of the well-surface relationship in each case. And, of course, effective economic planning calls for certainty in supply predictions. Unavailability of, or inattention to, critical information of this type makes it possible to transform well-operators who are located in an overdeveloped aquifer or near surface streams into involuntary dry land operators as they wait for senior rights to come back to life. Much ground water will remain inaccessible

to all, sealed from economic productivity by misapprehension of hydrologic fact."

▉ These wells must be administered in accordance with priority, along with other factors. Offhand, we know of no reason why the state engineer cannot take into account the relative priorities of wells, subject to appropriate judicial review. However, the issues involved have not been presented too thoroughly in the briefs and, therefore, it will be the better part of wisdom for us not to speak determinatively. Also, these questions can better be presented after the state engineer acts according to plan, rules and regulations.

### Right to Uplift and Use of Well
### Water by Senior Surface Users

Three points of view have been expressed as to the right of senior users to uplift by underground waters to support the stream's surface flow. The defendant states that there is no such right whatsoever. The plaintiff and intervenors maintain that there must be no lessening of any of the uplift. Some of the *amici* take a middle ground to the effect that the precept against wasting water demands that use be made by appropriators of underground flow under some regulation and that surface appropriators must take reasonable steps to supplement or protect their rights from the loss of uplift. In addition to the complexities of this which must be faced under planning and the establishment of rules and regulations, there is a further problem which is not before us in this case. This is the validity of the concept that one surface appropriator who drills a well must use the well water as a part of his surface priority, whereas another surface appropriator who has not sunk a well can demand his full priorities from the surface flow.

"Any owner of a water right, or a pro rata share of a water right, decreed to a ditch taking water from a surface stream to irrigate land under the ditch, and who

is also the owner of a registered well which can be used to irrigate land under the ditch, may divert the water owned by him to the extent of his decreed priority, but not in excess thereof, at the location and by the means stated in his well registration, if such diversion can be made without injury to the vested rights of any other owner and is evidenced by a temporary permit issued by the state engineer." Colo. Sess. Laws 1968, ch. 64, p. 197 [148-9-27(2)(a)].

It is premature for us to attempt to rule on "uplift" in this litigation.

The defendant went beyond the point necessary to protect his rights in refusing to cooperate with the water officials. He refused them the opportunity to examine his well and his operation of it. By reason of this intransigent attitude, which approached belligerency, he was the logical person against whom the first case should be filed. If all well owners adopted such an attitude, water administration would be next to impossible. For this reason our remand contains a direction not requested but nevertheless essential.

Our reversal is by reason of the arbitrary and capricious conduct on the part of the division engineer.

The judgment is reversed with directions to dissolve the injunction but to enjoin the defendant against interference with reasonable future investigation by the state engineer and those acting under him.

MR. JUSTICE PRINGLE concurs in the result. MR. CHIEF JUSTICE MOORE dissents.

MR. CHIEF JUSTICE MOORE dissenting:

Section 5, Article XVI, of the Colorado constitution provides that, "The water of every natural stream * * * [is] subject to appropriation * * *." Section 6 of the same article states that, "The right to divert the unappropriated waters of any natural stream to beneficial

uses shall never be denied," and that, "Priority of appropriation shall give the better right * * *."

In this action we are concerned with the Arkansas river which includes not only the waters visibly flowing on the surface of the river channel but also those waters found in the adjacent alluvial gravel fill through which they percolate and which are drawn by gravity in an easterly direction, moving at a relatively slow rate of speed, thus forming an underground supply of "transient storage" water. The visible water of the Arkansas river — that which is not located in the alluvium — flows on the top surface of the waters in transient storage in an open channel at a much higher velocity than that portion of the river which percolates through the alluvium. The visible and invisible portions of the river are so hydrologically connected with each other that water removed from the alluvium is replaced by other water from the alluvium as well as by water from that part of the river which appears on the surface.

When there is an over-abundance of water percolating through the alluvium from the sides of the open channel, the level of such water in transient storage is raised so that when it reaches the level of the open channel it appears as surface water. Any diversions of water from the river, whether from the surface stream by dams or headgates or from the transient storage by means of wells, come from the same source of supply and diminish the total volume of water in the stream. Waters diverted either by diversion dam and ditch, or by well and ditch, when used in agriculture, return to the stream to the extent that they are not consumed by evaporation or plant transpiration.

We must remember that the Arkansas river is made up of water visible on the surface of the ground, together with that which moves along at a relatively slow pace through the underlying alluvium, emptying into the surface stream from the sides of the visible channel

at those places where the top level of alluvium water is higher than the surface channel. The alluvium draws water away from the surface channel at places where the "transient storage" level of alluvial water falls below the visible surface.

This court has had many occasions to determine the identity of waters which are part of a "natural stream" and which are subject to appropriation governed by the law of priority. We have repeatedly held that all waters, whether on the surface or underground that are tributary to a natural stream, are a part of the natural stream and subject to appropriation. *Safranek v. Town of Limon,* 123 Colo. 330, 228 P.2d 975, and other cases cited in that opinion.

In the majority opinion the conclusion is reached that the judgment must be reversed for the reason that the action of the state engineer in closing down the Fellhauer well amounted to "arbitrary and capricious" conduct. The only possible basis for this conclusion is the fact that prior to taking action the state engineer had not promulgated "rules and regulations" under the legislative act (C.R.S. 1963, 148-11-22(1)) which requires the state engineer to administer the laws of the state relating to the distribution of

"* * * the surface waters of the state including the underground waters tributary thereto in accordance with the right of priority of appropriation, and he shall adopt such rules and regulations and issue such orders as are necessary for the performance of the foregoing duties."

The division engineer (Mr. Patterson) testified at some length concerning the facts justifying the order to close down the Fellhauer pumping operations. The trial court found nothing therein warranting the conclusion that "arbitrary and capricious" conduct was involved in his efforts to discharge his duties under the law. I find nothing in the record which justifies the conclusion that an "arbitrary and capricious" exercise of authority conferred by statute is involved in this case.

While it is true that the above quoted statute gives authority to issue "rules and regulations" and "orders" it is perfectly obvious that they are not limited to those directed to users of water, but may include those essential to the direction of employees of the state engineer in carrying out his complicated duties — the complexity of which is increased beyond foreseeable measure by the majority opinion in this case. It is also apparent that the statute is not a blanket mandate to issue rules, regulations, and orders, but only such as may be "necessary for the performance of the foregoing duties," of administering the laws of the state relative to the distribution of surface and ground waters.

Mr. Patterson testified that well regulations were not made pursuant to any rules, regulations or guidelines published by the state engineer, but were regulated pursuant to the provisions of C.R.S. 1963, 148-12-5(1) which provides in pertinent part that:

"The duties of the irrigation division engineer shall be as follows: He shall be governed by all laws relative to irrigation division engineers and shall have general control over the water commissioners of the several districts within his division. Under the general supervision of the state engineer, he shall execute the laws of the state relative to the distribution of water, in accordance with the right of priority of appropriation as established by judicial decrees. In the distribution of water, he shall be governed by the regulations of this chapter, and laws that are now in force, but for the better discharge of his duties, he shall have the authority to make such other regulations to secure the equal and fair distribution of water, in accordance with the rights of priority of appropriation, as, in his judgment, may be needed in his division. * * *"

His testimony was to the effect that under C.R.S. 1963, 148-12-6, he is supplied with a copy of the decrees adjudicated in his water district by the district court, which decrees are sufficient to provide adequate guide-

lines since all material factual matters are contained therein. He stated, "We regulate wells the same as we do the ditches of the Valley." Well regulation is based on the effect on senior appropriators, and if some diversions are so far removed from the stream or so situated that such regulation will produce no water to the stream system, they are not regulated. *Regulation of decreed wells depends upon whether the regulation thereof will provide water.* He further testified that wells were closed down on the basis of whether the effect would be material to the stream's system as a whole rather than for the benefit of a particular appropriator because the division engineer operates the stream as a system and not for the benefit of any one individual. In short, his statement was to the effect that above and beyond the direction of the statute and the court decrees, there was no need for the exercise of the statutory authority "to make such other regulations to secure the equal and fair distribution of water, in accordance with the rights of priority of appropriation, as, *in his judgment*, may be needed in his division." (Emphasis added.)

It appears that the division engineer encountered a public relations problem in dealing with appropriators of water from wells who took the position that their rights were being violated; that the engineer had no authority to regulate them; and that the law requiring their regulation was unconstitutional. He called a series of meetings in an effort to make explanation and to work out a plan. This conscientious effort to find an acceptable solution to a pressing problem can hardly be called "arbitrary and capricious" action. A program based upon cessation of well operations during the time between specific dates was discussed but no acceptable solution was reached by those participating in the meetings. *Thereafter, Mr. Patterson began administration of the law according to adjudicated priorities "based upon the demands of the senior appropriators and their senior*

*rights."* Admittedly he may have taken into consideration conclusions reached in these discussions, as he undertook to discharge his duties in the protection of the vested constitutional rights of senior appropriators of water. He testified as follows:

"A. The wells being nonadjudicated we could not recognize as having a particular differentiation between wells. Our state law provides that a water right granted in a subsequent adjudication is junior to all water rights granted in preceding adjudications irrespective of the date of first use, and a water right that has not been adjudicated must automatically be inferior to all water rights that have been adjudicated."

The substance of the above quoted statement has at all times heretofore been generally accepted as a correct statement of the law.

In this case the question arises as to whether the 1965 act in effect confers upon the engineer the authority to adjudicate priorities as between wells which theretofore had not sought decrees in adjudication proceedings conducted exclusively in the district court. The only language which conceivably might be construed as delegating this power to the engineer is that contained in C.R.S. 1963, 148-11-22(1) in which he is directed to regulate the distribution of water "* * * in accordance with the right of priority of appropriation. * * *" Under existing law as provided by C.R.S. 1963, 148-9-2, jurisdiction to adjudicate "Priority of appropriation of water between owners and claimants of water rights * * * is vested exclusively in the district court."

The majority opinion, notwithstanding numerous opinions of this court which frown upon such action, repeals this last mentioned statute by implication, and the only basis for so doing is the language in the 1965 statute that, "The state engineer * * * shall execute and administer the laws of the state relative to the distribution of the waters of the state including the underground waters tributary thereto *in accordance with the*

*right of priority of appropriation* \* \* \*." (Emphasis added.)

Under all the law pertinent to the doctrine of "priority of appropriation," an unadjudicated right is inferior to an adjudicated right, and neither the state engineer or division engineer could make a rule or regulation, or make a finding, the effect of which would be to overturn priorities duly established by court decree. Decreed priorities represent vested property rights which cannot be diminished in value without compensation to the owner. I am firm in my conviction that the state engineer is without authority to determine priorities of unadjudicated water rights, whether diverted by wells or otherwise so long as the exclusive power to determine priorities is vested in the district court by statute. Because he failed to enter this area of attempting to fix priorities as between unadjudicated wells (all of which were junior to all adjudicated rights) and because he did not issue "rules and regulations" concerning the order in which unadjudicated wells would be shut down, it is said that the division engineer acted "arbitrarily and capriciously." I cannot subscribe to such doctrine, and protest against such an announcement.

I am unable to find substantial basis for any conclusion that the state engineer "arbitrarily or capriciously" shut down the well of Fellhauer. In doing so he was following procedures used in the distribution of waters of the Arkansas river for one hundred years. *He did not shut down any appropriator of water until investigation disclosed that by so doing additional water would be made available to senior appropriators.* Admittedly he did not try to fix priorities among unadjudicated wells because jurisdiction to do so is "vested exclusively in the district court." (C.R.S. 1963, 148-9-2.) Admittedly Fellhauer's well had no adjudicated priority; admittedly any right claimed by him could never antedate the year 1935; admittedly numerous adjudicated rights with priorities as early as 1887 were without sufficient water

to fulfill their decreed rights; admittedly his well caused material injury to senior appropriators.

I am unable to understand how it can be said that the engineer acted "arbitrarily and capriciously" when all that he did was that which his predecessors in office had been doing for one hundred years. He shut down a diversion of water by a junior appropriator in order that senior and prior rights might be protected, as it was his duty to do under command of the constitution, statutes, and court decrees fixing priority rights. The constitution, statutes, and court decrees have heretofore supplied all the "rules and regulations" which have been deemed necessary in the water district here involved for about one hundred years to protect the vested interests of claimants to the use of water in that district.

As I see it, rights guaranteed by the constitution to senior appropriators of water which have heretofore been fortified and protected by statute and court decisions are being violated by the majority opinion announced this date. These rights, being overlooked or misapprehended, are the constitutional rights of senior appropriators to require the division engineer to stop illegal diversions of water which destroy the value of their vested, adjudicated, prior rights.

Whether in later adjudication proceedings the district court would be justified in fixing priority dates retroactively, or nunc pro tunc, under authority of the legislative act which purports to direct that:

"* * * The priority date of a ground water appropriation shall not be postponed to a time later than its true date of initiation by reason of failure to adjudicate such right in any such adjudication proceeding,"

C.R.S. 1963, 148-2-11, is a matter which raises serious questions involving vested rights. Determination of those questions are not essential to decision in the instant case. In this connection it is sufficient to direct attention to the constitutional provision which provides (Art. II, Sec. 11):

"No * * * law * * * retrospective in its operation * * * shall be passed by the general assembly."

I view with deep concern the general trend of the opinion of the majority which, as I perceive it, will tend to create many uncertainties in areas where certainty and stability are most essential to full enjoyment of vested rights of long duration. I am also deeply conscious of the fact that by the judgment of my brethren — whose earnestness, dedication, and sincerity I do not question — my dissenting views are without merit. Nevertheless I have been required by conscience to set them forth for the single reason that although, admittedly, I may be wrong, I am not in doubt.