No. 24725.

C. J. Kuiper, State Engineer; M. William Mattern, Supervising Engineer; and W. G. Wilkinson, Division Engineer, Water Division 1 *v.* Well Owners Conservation Association, a Colorado non-profit corporation; Donald E. Lindell; George T. White; Kenneth Snodgrass, individually and on behalf of others similarly situated.

(490 P.2d 268)

Decided October 12, 1971. Opinion modified and as modified rehearing denied November 22, 1971.

120

122

Duke W. Dunbar, Attorney General, John P. Moore,

Deputy, JAMES D. GEISSINGER, Special Assistant, BEN L. WRIGHT, JR., Special Assistant, for plaintiffs in error.

GEORGE A. EPPERSON, DONALD F. MCCLARY, STANLEY I. ROSENER, MILLER, RUYLE, STEINMARK AND SHADE, DAVID J. MILLER, FRANK E. STARKEY, for defendants in error.

FISCHER AND BEATTY, WARD H. FISCHER, for amicus curiae.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

THIS was an action for an injunction and a declaratory judgment with reference to rules and regulations for use of underground water promulgated by the State Engineer on July 14, 1969, effective August 8, 1969, as applied to the South Platte River. Appendix A, attached to this opinion, contains these rules and regulations, preceded by the State Engineer's memo of July 14, 1969, his document entitled "Mandate to Adopt Rules and Regulations" and his statement of "policy." The action was filed on July 29, 1969. A temporary injunction was issued against the State Engineer on August 27, 1969, and, after a second hearing, the injunction was made permanent on November 20, 1969. It is from the latter decree that the State Engineer brought this writ of error. We reverse.

The rules and regulations, which will be referred to as the regulations, resulted from *Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986 (1968) and the Water Right Determination and Administration Act of 1969. 1969 Perm. Supp., C.R.S. 1963, 148-21-1 *et seq.* In *Fellhauer* a water division engineer, acting under the statute then in effect (1965 Perm. Supp., C.R.S. 1963, 148-11-22) shut off 39 water wells out of 1600 major wells in the area without any written rules or regulations and without any pre-

scribed guidelines. It was held that this constituted an unconstitutional discrimination under the equal protection clause and a violation of due process. All of the wells were within the aquifer of the Arkansas River which constituted a part of the flow of that river. It was there said:

"Regulation of wells in the Arkansas Valley as contemplated by the 1965 act, in order to be valid and constitutional must comply with the following three requirements:

"(1) The regulation must be under and in compliance with reasonable rules, regulations, standards and a plan established by the state engineer prior to the issuance of the regulative orders.

"(2) Reasonable lessening of material injury to senior rights must be accomplished by the regulation of the wells.

"(3) If by placing conditions upon the use of a well, or upon its owner, some or all of its water can be placed to a beneficial use by the owner without material injury to senior users, such conditions should be made.

\* \* \*

"For nearly a century the waters of the Arkansas River have been used and reused many times over as they proceed from elevations exceeding 12,000 feet to 3,375 feet at the state line. These uses, and similar uses on other rivers, have developed under article XVI, section 6 of the Colorado constitution which contains *inter alia* two provisions:

'The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using water for the same purpose;'

Under those provisions and the statutes enacted thereunder a great body of law has been established. In the six briefs, all ably written, sixty Colorado cases have been cited. These decisions are concerned primarily with

the respective priorities of *vested rights* which have been established. It is implicit in these constitutional provisions that, along with *vested rights,* there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights.* We have known for a long time that the doctrine was lurking in the backstage shadows as a result of the accepted, though oft violated, principle that the right to water does not give the right to waste it."

The Water Right Determination and Administration Act of 1969, to which we will refer merely as the Act, provides that the State Engineer and Division Engineers shall administer, distribute, and regulate the waters of the state. It defines "waters of the state" as all surface and underground water in or tributary to all natural streams within the state. (Sec. 3(3).) It defines "underground water" as that water in the unconsolidated alluvial aquifer of a stream and all other waters hydraulically connected thereto which can influence the rate or direction of movement of water in the alluvial aquifer or natural stream. (Sec. 3(4).) The declaration of policy contained in the Act reads as follows:

"(1) It is hereby declared to be the policy of the state of Colorado that all waters originating in or flowing into this state, whether found on the surface or underground, have always been and are hereby declared to be the property of the public, dedicated to the use of the people of the state, subject to appropriation and use in accordance with law. As incident thereto, it shall be the policy of this state to integrate the appropriation, use and administration of underground water tributary to a stream with the use of surface water, in such a way as to maximize the beneficial use of all of the waters of this state.

"(2) (a) Recognizing that previous and existing laws

have given inadequate attention to the development and use of underground waters of the state, that the use of underground waters as an independent source or in conjunction with surface waters is necessary to the present and future welfare of the people of this state, and that the future welfare of the state depends upon a sound and flexible integrated use of all waters of the state, it is hereby declared to be the further policy of the state of Colorado that in the determination of water rights, uses and administration of water the following principles shall apply:

"(b) Water rights and uses heretofore vested in any person by virtue of previous or existing laws, including an appropriation from a well, shall be protected subject to the provisions of this article.

"(c) The existing use of ground water, either independently or in conjunction with surface rights, shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights, but at his own point of diversion on a natural watercourse, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled.

"(d) The use of ground water may be considered as an alternate or supplemental source of supply for surface decrees heretofore entered, taking into consideration both previous usage and the necessity to protect the vested rights of others.

"(e) No reduction of any lawful diversion because of the operation of the priority system shall be permitted unless such reduction would increase the amount of water available to and required by water rights having senior priorities. (Sec. 2)

\* \* \*

"The state engineer and the division engineers shall administer, distribute, and regulate the waters of the

state in accordance with the constitution of the state of Colorado, the provisions of this article, and other applicable laws and written instructions and orders of the state engineer, and no other official, board, commission, department, or agency, except as provided in this article and article 28 of chapter 66, C.R.S. 1963, as amended, shall have jurisdiction and authority with respect to said administration, distribution, and regulation. (Sec. 34)

"(1) The state engineer or the division engineers shall issue to the owners or users of water rights and to the users of waters of the state such orders as are necessary to implement the provisions of section 148-21-34, including, but not limited to, the orders specified in subsections (2) to (6) of this section. If such orders are given orally, they shall be confirmed promptly in writing.

"(2) Each division engineer shall order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is not necessary for application to a beneficial use; and he shall also order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is required by persons entitled to use water under water rights having senior priorities, but no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities. In making his decision as to the discontinuance of a diversion to satisfy senior priorities the division engineer shall be governed by the following: The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need. Such factors include the current and prospective volumes of water in and tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the

affected stream. Each diversion shall be evaluated and administered on the basis of the circumstances relating to it and in accordance with provisions of this article and the court decrees adjudicating and confirming water rights. In the event a discontinuance has been ordered pursuant to the foregoing, and nevertheless such does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded. If a well has been approved as an alternate means of diversion for a water right for which a surface means of diversion is decreed, such well and such surface means must be utilized to the extent feasible and permissible under this article to satisfy said water right before diversions under junior water rights are ordered discontinued." (Sec. 35)

The regulations were made effective from August 8, 1969 to October 15, 1969. They provided for three zones, Zone A, Zone B and Zone C, which are parallel with and on both sides of the surface of the South Platte River. Zones A were adjacent to the stream. Zones C were the farthest away from it, and Zones B were between Zones A and C. They defined Zone A as that area in which well pumping causes an effect upon the stream in less than ten days. Zone B was defined as the area in which such effect occurs within ten to thirty days. Zone C was defined as an area in which such effect occurs within thirty to seventy-five days. The zones extended from Henderson, which is a short distance downstream from Denver, to the Colorado-Nebraska state line. The State Engineer established the boundaries of the zones, using various studies which have been made of the South Platte River, principally by the United States Bureau of Reclamation.

The regulations provided that wells in either of the three zones might be shut down after the demand (here referred to as "call") by a senior surface appropriator whose priority could not be filled by the water then running in the stream. The regulations do not use the

term "shut down," but rather in its place use the term "regulate." Following the State Engineer's example, we will use the term "regulate" as meaning "shut down." The regulations forbade a division engineer from regulating a well in a ratio exceeding three out of each seven days, and placed upon him the duty to make the regulations at such times as would provide the most efficient use of the water during non-regulated times. Regulation of wells in Zone C was to cease September 1, 1969; in Zone B on September 25, 1969; and in Zone A on October 10, 1969. The regulations expired on October 15, 1969, and no wells were regulated under them.

## I.

The complaint was addressed to "The Hon. Donald A. Carpenter, District Judge, Sitting As Water Judge, Water Court, Water Division I." The initial pleading filed by the Attorney General, acting on behalf of the State Engineer, was a motion for change of venue to the district court for the City and County of Denver. This motion was denied, and on August 21, 1969, we declined to consider the issue under a request by the Attorney General for relief in the nature of prohibition. We now address ourselves to this issue.

It is the position of the Attorney General that a determination of the validity of rules and regulations, such as these, should be made only under the provisions of the Administrative Code (1969 Perm. Supp., C.R.S. 1963, 3-16-5), which places venue in the City and County of Denver. The Act provides for seven water divisions in the state and the appointment annually of a water judge in each of these divisions, such water judge to be a judge of one of the district courts within the division. The Act further provides:

"There is established in each water division the position of water judge of the district courts of all counties situated entirely or partly within the division. Said district courts collectively acting through the water judge shall have exclusive jurisdiction of water matters within the

division, and no judge other than one designated as a water judge shall act with respect to water matters in that division. Water matters shall include only those matters which this article and any other law shall specify to be heard by the water judge of the district courts." (Sec. 10(1).)

The Act provides that the water judges shall make determinations of water rights and conditional water rights, approve plans for augmentation and, after a certain time, take jurisdiction of water adjudications pending at the time of passage of the Act. It places the responsibility for administration and distribution of water upon the State Engineer and the division engineer. It provides that any injunction to enforce orders of the State Engineer or the division engineer shall be issued by the water judge of the division involved.

It is true that the Act does not mention specifically this type of action, but the legislative intent is apparent that the water judges have exclusive jurisdiction of determining the validity of the rules and regulations of the State Engineer. It would be illogical — in fact nearly unthinkable — for the General Assembly to set up a system for the determination of "water matters" and to provide for the selection of judges skilled in this field of law to preside as water judges, and then turn the determination to a non-water judge of a subject that goes to the very heart of the administration of water.

In addition to the motion for change of venue, the Attorney General contemporaneously filed a motion to dismiss for lack of jurisdiction over the subject matter. This motion had the same basis as the one for change of venue. The trial court was correct in its denial of these two motions.

II.

Exclusive of tributaries, there are between six million and ten million acre feet of ground water in the Platte River basin from Henderson to the state line. The wells involved in this case, which are pumping from this flow-

ing reservoir, are unadjudicated. As a result, any adjudicated decree has priority over these wells. There has not been a physical measurement of the amount of water which the pumping of a well depletes from the stream, or of the amount of water which would reach the stream as a result of cessation of pumping, or of the time that would elapse for various portions of the unpumped water to reach the stream. Therefore, of necessity any regulation of well pumping and determination of the effect thereof upon the surface stream must be predicated upon hydrologic projections. In devising the rules and regulations and attempting to place them in effect upon the Platte River, the State Engineer and those acting under him used quite a wealth of material. This material included studies of the underground movement of water in the Platte River basin made by the United States Bureau of Reclamation, the United States Department of Agriculture, the United States Geological Survey and a study completed for the Colorado Coordinator of Natural Resources in 1967.

These and other studies were admitted in evidence, together with texts and reports on the subject. We have given considerable study to this research and scientific information; and, while we may think that we have, to an extent, familiarized ourselves with this scientific data, yet, we do not hesitate to admit that it is far beyond our powers of articulation — and perhaps this is true even of experts in the field — to adequately describe for fellow lay readers the scientific tools utilized, such as the complex formulae and their esoteric factors and elements, the graphs, and also the abstruse projections. As a result, our treatment of the scientific evidence will be somewhat limited.

The alluvial flow of the Platte River is, of course, caused by gravity. It is generally toward the stream on the diagonal. In other words, the flow in the aquifer is both down stream and toward the stream. As mentioned in *Fellhauer*, the surface flow of the river rides piggy-

back on the subsurface flow. It follows that any with-drawal of the ground water will have some effect on the stream. Here, however, we are primarily concerned with the top of the underground water table, which is a sloping plane and is known as the hydraulic gradient.

When the pumping of a well is commenced, the hydraulic gradient surrounding the well becomes an inverted cone, called the cone of depression. As water continues to be pumped, the excess of the water pumped over the water naturally flowing to the cone of depression causes the cone to become greater in diameter and, the depth of the well remaining constant, the hydraulic gradient changes until a stable cone size is reached.

Obviously, the water pumped does not proceed on its way underground toward the stream. (If the pumped water is used for irrigation, 60% of it is consumed by evapotranspiration.) The hydrologists must first determine the times and amounts in which water would have proceeded toward and into the stream had it not been pumped, and in what time and amounts unpumped water will reach the stream after pumping ceases. To make these computations the scientists must compute the water transmissibility and the storage capabilities of the aquifer. They must determine the coefficient of transmissibility, which is the rate of flow of water, in gallons per day, at the prevailing temperature, through a vertical plane of the aquifer one mile wide extending the full height of the aquifer under a hydraulic gradient of one foot per mile. Also, they must determine the storage coefficient, which is a decimal fraction representing the portion of the volume of water which can be drained from a defined entire volume of saturated aquifer. More simply, it can be said that by these coefficients an expression can be made of how much available water lies underground and how easily it moves through the alluvial material.

The next step is to calculate the effect upon the stream by cessation or partial cessation of pumping. This involves essentially the refilling or partial refilling of the

cone of depression. The rate at which it fills is also calculated by formulae embracing the coefficient of transmissibility and the coefficient of storage. Further computations will project the passage of water to the stream as the cone fills. Included in these factors are the distance of the well from the stream, the pumping time and schedule, and the total volume pumped.

The pumping or cessation of pumping of any particular well in a zone would not have the identical effect upon the stream as any other well in that zone. Rather, the State Engineer formed the boundaries of Zones A, B and C by attempting to determine the average effect of pumping and cessation of pumping of wells in each particular zone. More explicitly, he at least thought that he had computed the average time it would take water in appreciable amounts to accumulate and move as a result of cessation of pumping: 0 to 10 days to reach the stream from Zone A; 10 to 30 days from Zone B; and 30 to 75 days from Zone C.

It is apparent from the trial court's findings that it gave no probative effect to the scientific evidence presented by the State Engineer. Its findings, upon which it based its decree that the regulations were null and void, may be summarized as follows:

1. They are unreasonable and vague under the Fourteenth Amendment to the Constitution of the United States and Colo. Const. art. II, §25.

2. They are contrary to the Water Right Determination and Administration Act of 1969.

3. They are contrary to law generally.

4. They are contrary to the rules established by Fellhauer; do not properly take into consideration the requirements and factors there announced; and, particularly, enforcement of them will not cause a reasonable lessening of material injury.

5. They are discriminatory, arbitrary and capricious.

6. They are unreasonable, vague and unenforceable.

7. They do not promote the continuance of existing uses.

8. They interfere and impede the withdrawal of unappropriated ground water, contrary to law.

9. Shutting down of wells will not cause water to reach the stream to satisfy any call in time of need.

10. They promote and encourage futile calls.

11. Waste will result from shutting off wells.

12. Vast quantities of water are pumped without any material injury to surface appropriators and without any appreciable effect on the stream.

13. In the past 40 years the amount of water available has greatly increased the stream flow of the river.

14. Shutting down of wells is inconsistent with the "one river" concept.

15. They utilize previous inadequate laws which have been repealed or revised.

16. They do not promote the development and use of underground water.

17. They are neither sound nor flexible for the integrated use of all the waters of the state.

18. They permit appropriators to command the whole flow of the stream merely to facilitate the taking of a fraction of the whole flow to which an appropriator may be entitled.

19. They fail to require the diverter to establish reasonable means of effectuating diversion works.

20. They fail to require that, before a surface appropriator can place a call on the river, the wells owned by him shall be charged first against his decree as to surface water.

21. They do not maximize the beneficial use of waters.

22. They do not take into account relative priorities of wells.

23. The zoning of wells is contrary to law.

24. They were prepared and issued prematurely.

The decree permanently enjoined the State Engineer from enforcing or attempting to enforce the regulations. It contains the following language:

"[T]he Court finds that the State Engineer may and

should charge to the surface decree the amount of water diverted by wells and applied to the same lands, as are served by a surface decree, prior to the recognition of any purported call under the surface decree."

██ We hold that the evidence was insufficient to support the findings and decree. However, since there was some evidence supportive of some of the findings, we summarize the evidence submitted by the plaintiffs.

At the hearing on the temporary injunction the plaintiffs established the adoption of the regulations. They placed six farmers on the witness stand who testified that the shutting down of their wells under the regulations would damage them substantially, giving the dollar figures. Two witnesses for the plaintiffs testified that enforcement of the regulations would very seriously interfere with the municipal water supply of Fort Morgan.

It was stipulated that the evidence presented at the preliminary injunction hearing should be considered by the court in connection with whether or not it later issued the permanent injunction. The matter of whether or not the temporary injunction should have issued has never been and is not before us. We mention in passing, however, that the plaintiffs' showing was utterly insufficient to justify the temporary injunction which the court issued. It goes without saying that a junior appropriator who is obliged to cease irrigation is going to be damaged. We are unable to see how evidence at this first hearing bore upon the matter of whether the regulations were valid.

We now proceed to the evidence adduced by the plaintiffs at the main hearing, following which the permanent injunction issued. A well contractor testified that during the past 35 or 40 years he had drilled approximately 1,000 wells in the area in question; that there is a horizontal clay layer which, at Fort Morgan, is around 130 feet below the surface and, at Sterling, is nearer the surface; and that the strata lying below and above this clay

layer do not "inter-relate." We note that, significantly, this is the only witness who testified concerning a clay layer and that neither he nor any of the other witnesses testified that waters in any part of the alluvium would not reach the surface stream.

A registered engineer, who had been superintendent of an irrigation system on the Platte River, gave his objections to the regulations. These were (1) that if a surface appropriator makes a call for water and as a result a well is partially shut down and, before the water not pumped reaches the appropriator's point of diversion an intervening storm caused the appropriator to cancel his call, the water not pumped is wasted; (2) that return flow to the river is much greater than it was 40 years ago; (3) that for a senior appropriator to be permitted to call for well water and not apply his own well water to filling the surface decree constitutes a "double use" of water; (4) that he does not believe that well pumping has depleted the amount of underground water; (5) that the alluvium and the surface stream are one and the same; and (6) that, not being a hydrologist, he was not familiar with consumptive use or return flow matters.

The next witness was the superintendent of an irrigation system and city engineer of Fort Morgan and Brush, who had acted as hydraulic engineer for the United States geological survey for six years from 1936 to 1942. His objections to the regulations were that (1) they did not follow the principal of first in use, first in right; (2) the zones are too far from the river; (3) there wou'd be discrimination between wells which lie close to, and on opposite sides of, a zone boundary; (4) it is unreasonable to shut down a well since it does not give an immediate boost to the surface stream; (5) shutting down wells does not materially help a user; (6) surface diversions are not completely effective because they are incapable of diverting the whole river, including the flow in the alluvium; (7) the failure to require a person making the call to shut down his own wells is inequit-

able; (8) "My opinion of a futile call to obtain maximum utilization of the water is that seventy-five per cent of the water that is called should reach the point of destination"; (9) there is no duty placed upon the senior surface appropriator to obtain water from the alluvium; (10) 50 more wells strategically placed would solve the entire problem; (11) the regulations are inequitable, not at all fair, and are separating one river into two; and (12) if 2,000 wells were shut down not more than 50 cubic feet of water per second of time (cfs) would be returned to the surface stream. When questioned as to the basis of the last statement this witness stated that it was a generality.

Another witness was a municipal and drainage engineer with experience in ground water hydrology matters. He agreed with the mathematics employed in the regulations and the studies upon which they are based, but questioned whether they could be applied equitably as a practical matter. He testified that transmissibility was not uniform in the Platte Valley. He expressed the opinion that there were better ways of managing water and that well pumping should be charged against surface decrees.

After study of the record and particularly the court's findings, one has the impression that the rule followed was that the state engineer had the burden of proof of the validity of his regulations. On the contrary, his regulations are presumed to be valid until shown otherwise by a preponderance of the evidence. *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937); *New York Foreign Freight Forwarders and Brokers Association, Inc. v. Fed. Maritime Comm'n.*, 337 F.2d 289 (1964), *cert. denied*, 380 U.S. 910 85 S.Ct. 893, 13 L.Ed. 797, and *National Customs Brokers & Forwarders Ass'n of America, Inc. v. Fed. Maritime Comm'n.*, 380 U.S. 914, 85 S.Ct. 902, 13 L.Ed. 2d 800; *Perko v. United States*, 204 F.2d 446 (1953), *cert. denied*, 346 U.S. 832, 74 S.Ct. 48, 98 L.Ed. 355; *United States v.*

*Obermeier,* 186 F.2d 243 (1950), *cert. denied,* 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685; and *Carter v. Forrestal,* 175 F.2d 364 (1949).

"Those who insist that such a regulation is invalid must make its invalidity so manifest that the court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the act." *Boske v. Comingore,* 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900).

█ There was before the court a wealth of evidence supporting the validity of the regulations. As will be discussed in connection with the trial court's findings later in this opinion, a great deal of the plaintiffs' testimony was immaterial to the issue of the validity of the regulations. It simply is not sufficient to predicate a nullification of the regulations upon the bald statement, without supporting facts, that there is enough water for everybody; or that the witness thinks the rules are inequitable; or that the transmissibility is not uniform throughout the aquifer; or the unsupported statement that shutting off 2,000 wells would produce only 50 cfs.

We now discuss the court's findings in the same order as listed earlier.

██ 1. The court did not elaborate on the reasons why it considered the regulations to be so unreasonable and vague as to be violative of the Fourteenth Amendment and Colo. Const. art II, §25. We assume that the court meant that it found them violative of due process. The defendants in error have not argued this proposition. As later appears in this opinion, we do not regard the regulations as unreasonable and vague. We apply the familiar proposition that regulations and statutes are presumed to be constitutional until shown otherwise. *People, ex rel. v. Letford,* 102 Colo. 284, 79 P.2d 274 (1938); and *Flank Oil Co. v. Tennessee Gas Transmission Co.,* 141 Colo. 554, 349 P.2d 1005 (1960). No such showing having been made, we will not uphold the finding of unconstitutionality.

In *Railroad Commission of Texas v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940) it was stated:

"Certainly in a domain of knowledge still shifting and growing, and in a field where judgment is necessarily beset by the necessity of inferences bordering on conjecture even for those learned in the art, it would be presumptuous for courts, on the basis of conflicting expert testimony, to deem the view of the administrative tribunal, acting under legislative authority, offensive to the Fourteenth Amendment."

2. To support the finding that the regulations are contrary to the 1969 Act, defendants in error argue that it is the purpose of the Act to maximize the beneficial use of all the waters of this state and that the regulations do not do this. It is apparent from the other findings that the basis of this argument is that the State Engineer should have made entirely different regulations.

It is reflected throughout the record that the studies of the Platte River were not completed. There was testimony that far more would be known about underground flows in two years from the time of hearing (September 1969) as a result of studies then in progress. It would be an impossibility for the State Engineer in 1969 to promulgate regulations which would realize the maximum use of all of the surface and ground water of the Platte. All that can be expected is that he exercise his best judgment, using information then available to *attempt* to reach the goal of maximal use, of course without being arbitrary or capricious. No doubt the State Engineer, with the elapse of more than two years since the hearing, can develop regulations which will be closer to the development of maximum use. We refer to the aphorism that "Rome wasn't built in a day" and hold that under the record as submitted the predominant showing was that the State Engineer proceeded in good faith to follow the policy of the statute and that he did substantially follow that policy.

3. Our attention has not been directed as to how the regulations generally are contrary to law. Therefore, we do not discuss this finding further.

4. The court found and it is contended that the regulations do not comply with the rules established by *Fellhauer*, do not properly take into consideration the requirements and factors there announced and, particularly, that enforcement of them will not cause a reasonable lessening of material injury. The case presented by the State Engineer showed convincingly that he was attempting to follow the mandates of both *Fellhauer* and the statute. The defendants in error urge support of the court's finding as to *Fellhauer* partially for the reason that the regulations should have been applied to other factors. We will consider those other factors later in this opinion. The rest of the argument is only supported by: (1) a witness' statement that a clay layer lies between the strata of aquifer and that the strata do not "interrelate," without any testimony that the water of either stratum does not reach the surface stream; (2) testimony, unsupported by studies or facts, that the witness does not believe that well pumping has depleted the amount of underground water; and (3) the bald statement of the witness that, while the mathematics employed were correct, he questioned whether the regulations could be applied equitably as a practical matter. This testimony is wholly insufficient to override the compelling showing in the record that the State Engineer had made a dedicated effort to comply with *Fellhauer*, and that he did so.

While the court did not make a finding as to the matter, the defendants in error established at the hearing that the State Engineer had not used one factor mentioned in *Fellhauer*, being the depth of the wells. At the time we wrote *Fellhauer* we thought, and still think, that there can be situations in the regulation of wells in which the depth of the well is material. There was testimony that under these particular regulations the depth of the wells was not material. There was no testimony to the

contrary. Therefore, even if depth may be a factor under certain situations, the failure to use it in the regulations under consideration does not defeat them.

5. and 6. The court made two findings that the regulations (a) were discriminatory, arbitrary and capricious and (b) were unreasonable, vague and unenforceable. As to vagueness, we are entitled to exercise our own independent judgment because this involves the legal effect of written regulations. We simply disagree with the trial court and find the regulations not to be fatally vague.

As to enforceability, we have been unable to find anything in the record indicating that the regulations are unenforceable.

■ One of the arguments given to establish that the regulations are discriminatory, arbitrary, capricious and unreasonable was that, in the case of two wells which are fairly close to each other but are on opposite sides of a zone line, one well is permitted to resume 100% pumping sooner than the other. Several of the plaintiffs' witnesses mentioned this. While some of the plaintiffs' witnesses appeared to be opposed to any pumping and while some thought that the zones were extended too great a distance from the river, the general principle of zoning in the regulation of wells was not challenged. The record amply supports the principle of zoning. To have zones there must be boundary lines thereof and, no matter where those lines might fall, the criticism could be made. It was the testimony of the witnesses in behalf of the State Engineer that the lines had been placed after considerable study in order to have the average time of return flow in each zone the same. We conclude that this objection is not sufficient to invalidate the regulations.

■ It might be contended that the testimony to the effect that 50 wells strategically placed would answer the entire problem makes the regulation discriminatory, arbitrary, capricious and unreasonable. The answer to this is that the State Engineer does not have statutory

authority to place and dig any wells. Assuming the truth of the statement, it has no effect upon the character of the action of the State Engineer.

Other factors relating to the alleged discriminatory, arbitrary, capricious and unreasonable character of the regulations are considered elsewhere in this opinion.

7. As to the finding that the regulations do not promote the continuance of existing uses, it must be said that this begs the question. If the regulation of wells which are inferior in priority will reasonably contribute to the satisfaction of earlier priorities, the owners of the wells cannot be heard to say that they have a right to continue the use thereof.

 8. The court found that the regulations interfere and impede the withdrawal of unappropriated ground water, contrary to law. We agree that they interfere and impede the withdrawal of ground water. However, when adjudicated priorities are not being filled as a result of pumping, it cannot be said that this ground water is unappropriated.

 9. 10. and 11. Three of the findings are related: (1) shutting down of wells will not cause water to reach the stream to satisfy any call in time of need; (2) the regulation promotes and encourages futile calls; and (3) waste results from shutting off of wells. Several witnesses on behalf of the plaintiff testified that by the time water reached the point of diversion of a person making a call the person might no longer need the water by reason of an intervening storm. We are not favorably impressed with this argument because the same thing is true with respect to calls upon inferior surface diversions, albeit to a lesser extent of time. As an illustration, if a ditch near Sterling, Colorado, having senior priority, should make a call under which the ditches with inferior priorities in the upper reaches of the Platte River in the South Park area would have to cease diversion, it is common knowledge that it would take 10 to 14 days for the water to flow from South Park to Sterling. We can

see no logical distinction between the result of an intervening storm in the case of a call on a surface right and the case of a call on a well.

We found no evidence in the record to support the finding that the regulations promote and encourage futile calls. By "futile calls" we believe the court had in mind calls that, by reason of an intervening storm, caused the senior surface appropriator to be no longer in need of the water by the time it reaches him.

In this connection we make mention of the fact that in the regulations as drafted prior to the State Engineer's hearings, the regulation of wells was permitted in anticipation of a future call by a senior down-stream appropriator. Following the hearings the State Engineer made changes to provide that wells could not be regulated in the absence of a call. We note that in the amendment of the statute by the Forty-eighth General Assembly of Colorado, 1969 Perm. Supp., C.R.S. 1963, 148-21-34 was amended by adding the following:

"2(a) In the adoption of such rules and regulations the State Engineer shall be guided . . . by the following:

* * *

"(d) Consideration of the relative priorities and quantities of all water rights and the anticipated times of year when demands will be made by the owners of such rights for waters to supply the same." Colo. Sess. Laws 1971, ch. 372 § 1.

The record does not support the finding that waste results from shutting off wells. Here, again, is the matter of an intervening storm eliminating the need for called water which is proceeding toward the stream. The record discloses that this water can be "picked up" by other wells; and that, after reaching the stream, it can be used by junior surface appropriators who otherwise would not be able to obtain water.

 12. and 13. The court found that vast quantities of water are pumped without any material injury to surface appropriators and without any appreciable effect

on the stream; and that in the past 40 years the amount of water available has greatly increased in the stream flow. It was established that the Platte is a "gaining" river, meaning that, as a result of return flow, more water flows therein at points downstream than at points upstream. There was also evidence that, prior to the time additional water was placed in the Platte River drainage basin by trans-mountain diversion, less water flowed in the Platte River. These facts do not support the finding that no appreciable amount of the unpumped water would reach the surface stream, absent pumping. There was substantial evidence to the effect that gravity causes ground water to reach the surface of the stream and that pumping diminishes the amount that flows into the stream. The plaintiffs' evidence was quite insufficient to establish the contrary.

It is apparent from the record that the trial judge found substantial support for his conclusions in a report as to flowage of the river in the fall months at the Balzac station. Near the conclusion of the hearing, he asked that an exhibit be furnished showing this flowage and later, at the time of final arguments, the record of flowage for a period in excess of 40 years was introduced in evidence without any testimony in explanation thereof. We cannot evaluate the exhibit and find it rather meaningless.

14. Our attention has not been directed to, nor have we been able to find, any evidence in the record supporting the finding that the shutting down of wells is inconsistent with the "one river" concept.

15. We have not been advised as to how the regulations utilized previous inadequate laws which have been repealed or revised, nor do we find anything in the record on the subject. Therefore, we regard the finding as meaningless.

16. The court found that the regulations do not promote the development and use of underground water. As previously indicated, better methods may be dis-

covered in the future. It may be that in another proceeding sufficient evidence can be introduced to support some of the court's findings. Under the evidence in this case, the only proper finding must be that the regulations do promote the development and use of underground water.

17. It was found that the regulations were neither sound nor flexible for the integrated use of all the waters of the state. We regard the real question here as whether or not these regulations are sound and sufficiently flexible for the integrated use of waters in the Platte River Valley. While the regulations appear to be written for the entire state, it is obvious from paragraph numbered nine thereof that enforcement was to be directed first to the South Platte and Arkansas Rivers. The statute did not require the State Engineer to make the regulations uniform in every river drainage. In the amendment mentioned earlier by the Forty-eighth General Assembly the following was added to 1969 Perm. Supp., C.R.S. 1963, 148-21-34:

"(2) (a) In the adoption of such rules and regulations the State Engineer shall be guided by the principles set forth in Section 148-21-35 (2) and by the following:

"(b) Recognition that each water basin is a separate entity, that aquifers are geologic entities and different aquifers possess different hydraulic characteristics even though such aquifers be on the same river in the same division, and that rules applicable to one type of aquifer need not apply to another type. All other factors being the same, aquifers of the same type in the same water division shall be governed by the same rules regardless of where situate.

"(c) Consideration of all the particular qualities and conditions of the aquifer." Colo. Sess. Laws 1971, ch. 372 § 2.

We are not attempting to pass upon the validity of this amendment, but do comment that it shows legislative intent and mandate that the regulations need not be

uniform throughout the state. We believe this lends authority to our conclusion that the regulations should be considered here solely with respect to their application on the Platte River.

 18. The court found that the regulations permit appropriators to command the whole flow of the stream, merely to facilitate the taking of a fraction of the whole flow, to which an appropriator may be entitled. The error in this is that the regulations did not cause pumping to cease more than 3/7th of the time and, therefore, they did not "command the whole flow of the stream."

 19. When the court found that the regulations failed to require the diverter to establish reasonable means of effectuating diversion works, we assume that the court might have had one or both of the following matters in mind, upon which there was some testimony: (1) that the diverter should supplement his surface decree with well water; and (2) that, in order to have an effective surface diversion of ground water, the diverter would have to construct a dam across the entire alluvium. We shall comment upon the first matter in connection with the next finding discussed. As to the second, the testimony showed without conflict that the cost of such an underground dam would be prohibitive. We fail to perceive any other basis for this finding and find it, therefore, without weight.

 20. The predominate thrust of the plaintiffs' case was directed toward the finding that the regulations are fatally defective because they fail to require that before a surface appropriator can place a call on the river, the wells owned by him must be charged first against his surface water decree. This is true under the 1969 Act if the well water has become related to the surface decree under the approved plan of augmentation. Otherwise that act does not require, and we know of no other requirement compelling, an owner of a surface decree to first apply his well water to that decree before making the call upon junior appropriators, be they sur-

face or underground. Both the Act and the State Engineer's statement of policy state that use of ground water may be considered as an alternate or supplemental source of supply for surface decrees heretofore entered, taking into consideration both previous usage and necessity to protect the vested rights of others. The Act is quite specific in giving mandates by using the word "must," and in making matters permissive by using the word "may." The language in the statute here considered is permissive and does not require a surface appropriator to apply ground water to his decree before making a call. The Forty-eighth General Assembly in the same amendment mentioned earlier to § 34 adopted the following language which makes it clear that the General Assembly intends exactly the opposite to the erroneous finding and mandate made by the court. This reads:

"[G]round water diversions shall not be curtailed nor required to replace water withdrawn, for the benefit of surface right priorities, even though such surface right priorities be senior in priority date, when, assuming the absence of ground water withdrawal by junior priorities, water would not have been available for diversion by such surface right under the priority system. The state engineer may adopt rules and regulations to assist in, but not as a prerequisite to, the performance of the foregoing duties.

\* \* \*

"[The State Engineer shall be guided by] recognition that one owner may own both surface and subsurface water rights." Colo. Sess. Laws 1971, ch. 372 § 2.

The *amicus curiae* urge upon us that the order of the trial court to the effect that the State Engineer must require application of appropriator's well waters to the surface decree before making a call is unconstitutional. We are not going to pass on the constitutionality of the matter. We may agree with the trial court that, if his mandate could be constitutionally required, it would promote the maximum use of water. However, it is not

the present state of the law that the State Engineer is required to compel a person with a senior surface priority to use his ground water to apply on that priority before he makes a call. If a change in this can be made constitutionally, it lies entirely within the province of the legislative branch of our government and not within ours. The finding and order in this respect were clearly erroneous.

21. We have already discussed the effect of the court's finding that the regulations do not maximize the beneficial use of water in our earlier discussion of the contention that the regulations do not follow the policy of the 1969 Act.

22. The court found that the regulations did not take into account the relative priorities of wells. Since only unadjudicated wells were involved, it is apparent that the court concluded that the State Engineer must establish priorities of unadjudicated wells. This matter has not been argued and, therefore, we do not pass on the correctness of the court's finding.

23. We have already held herein that there was an insufficient showing to justify the finding that the zoning of wells is contrary to law.

24. Counsel argued that the regulations were prepared and issued prematurely, but the record does not support the argument nor the finding to that effect. The State Engineer testified that the work on the regulations was commenced before final passage of the 1969 Act. They were issued after the Act was adopted and after a hearing had been held by the State Engineer. The record shows that the State Engineer was in close contact with the General Assembly with respect to the 1969 legislation and that, at the time he commenced studying preparation of the regulations, he anticipated correctly the nature of the legislation to be adopted. We can find nothing to support the finding that they were prepared and issued prematurely.

In *Fellhauer,* we attempted to sound the note of a

new era in the utilization and optimal use of water. It appears to us that the General Assembly reacted favorably to that attempt and in turn sought to promote in detail the general thought of *Fellhauer*. We have the same view of the acts of the State Engineer. We suggest that there is a slight indication of a feeling upon the part of the plaintiffs and on the part of the trial court that changes should not be required in the operation of wells on the Platte River. There must be change, and courts, legislators, the State Engineer and users must recognize it. We recognize that future research and testing may prove erroneous some of the things that we found were predominately shown in the record. By the same token, further research and testing will not only result in correction of past mistakes, but also will lead us closer to the goal of minimal waste of water.

The regulations were to be effective only until October 15, 1969. Admittedly, we have passed upon issues that have become moot as these regulations are no longer in existence. However, the problem involved is not moot and we have written thus for the guidance of the entire state and its agents that there may be constructive progress. There is no need for remand or further action by the trial court, because it is impossible now to enforce the regulations as they apply to water flow in 1969.

Judgment reversed.

---

## APPENDIX A

### DIVISION OF WATER RESOURCES

1845 Sherman Street

Denver, Colorado 80203

July 14, 1969

TO: Those Persons or Entities on the Permanent Mailing List of the State Engineer

FROM: C. J. Kuiper, State Engineer

SUBJECT: Rules and Regulations

Enclosed herein is a copy of the Rules and Regulations which have an effective date of August 8, 1969.

As you know, an informal conference concerning the establishment of rules and regulations was held on March 24, 1969 in Denver, Colorado. On April 2, 1969 a formal hearing on the same subject was held in Denver, Colorado.

As a result of the hearings and the plan adopted by this office, the proposed rules and regulations were forwarded to the Attorney General on April 21, 1969. The Attorney General must pass on their constitutionality and legality. Before the Attorney General could render his opinion, it was necessary that he review these proposed rules and regulations in conjunction with new legislation adopted by the First Regular Session of the 47th General Assembly. On July 8, 1969, the Attorney General advised this office that, with the exception of one rule, which rule has been deleted, the enclosed Rules and Regulations are legal and constitutional.

You will note in Rule 9, there is on file in this office and in the offices of the Division Engineers of Irrigation Divisions Nos. 1 and 2, Exhibit "A" and Exhibit "B" which are maps of the South Platte and Arkansas Rivers, respectively, and their major tributaries which are zoned as set forth in that rule. You may inspect these maps at any time.

If you have any questions concerning the operation of these rules and regulations, please feel free to contact the Division Engineer, the Water Commissioner in your area, or members of my staff.

/s/ *C. J. Kuiper*
C. J. Kuiper
State Engineer

CJK/DHH:grl
enclosure

DIVISION OF WATER RESOURCES
OFFICE OF THE STATE ENGINEER
IRRIGATION SEASON, 1969

RULES AND REGULATIONS

## MANDATE TO ADOPT RULES AND REGULATIONS

These rules and regulations are adopted pursuant to Section 148-11-22, Colorado Revised Statutes 1963 (1965 Supp.), which section was amended by 148-21-34, 148-21-35 and 148-21-36 of Section 1 and by Section 22 of Senate Bill No. 81 of the First Regular Session of the Forty-Seventh General Assembly of the State of Colorado and also by general authority given the State Engineer in 148-11-3 (1) (h) of Section 2, Senate Bill No. 105, First Regular Session of the Forty-Seventh General Assembly of the State of Colorado.

In adopting these rules and regulations, the pronouncement of the Colorado Supreme Court in the case of *Fellhauer vs. the State of Colorado, et al,* Advance Sheets for December 9, 1968, Volume 21, Number 6, are to be followed. In this case it was said that in order for regulation of wells to be valid and constitutional under the above act, regulations must comply with the following three requirments.

"(1) The regulations must be under and in compliance with reasonable rules, regulations, standards and a plan established by the state engineer *prior to the issuance of the regulative order.*

(2) Reasonable lessening of material injury to senior rights must be accomplished by the regulation of the wells.

(3) If by placing conditions upon the use of a well, or upon its owner, some or all of its water can be placed to beneficial use by the owner without material injury to senior users, such conditions should be made."

## POLICY

These rules and regulations will follow a general policy stated as follows:

(1) The relative rate of movement of ground water as compared to surface water is considered herein. Every effort is made to utilize the water found in the alluvium which water is hydraulically connected to the surface channel of the streams of the state.

(2) Water rights and uses heretofore vested in any person by virtue of previous or existing laws shall be protected.

(3) The existing use of ground water, either independently or in conjunction with surface rights, shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights.

(4) The use of ground water may be considered as an alternate or partial source of supply for surface decrees heretofore entered, taking into consideration both previous usage and the necessity to protect the vested rights of others.

(5) Cooperative agreements previously made which result in

maximum utilization of both surface and subsurface water supply without injury to vested rights shall be recognized to the fullest extent possible in implementing these rules and regulations.

While stated above, it is again set forth that these rules and regulations are designed to accomplish three main purposes:

1. Protect the vested rights.
2. Preserve the economy that has been established by the construction and use of wells to the fullest extent possible.
3. Obtain maximum possible utilization of the waters of the state.

## RULES AND REGULATIONS

1. The period of time that these rules and regulations shall be in effect is from August 8, 1969 to October 15, 1969.

2. These rules and regulations shall affect all water courses of the state unless exempt in Rule No. 3. A water course, in Colorado, is a place on the surface of the ground in which water naturally flows regularly or intermittently, in a defined channel and with a perceptible current. The water of a water course is the natural stream and consists of all water, above or below the surface of the ground, and within the vertical boundaries of the area whose surface drains gravitationally toward the place where such current is perceptible, except such ground water as is incapable of contributing to the support of and not contributed to by the surface flow.

3. These rules and regulations are not applicable to designated ground water basins as defined and established by Article 18 of Chapter 148, Colorado Revised Statutes 1963, as amended; nor to wells used solely for stock watering, domestic or other purposes as defined in Section 148-18-4, Colorado Revised Statutes 1963, as amended.

4. In recognition of the extraordinary problem which exists within the drainage basins of the Arkansas and South Platte Rivers as a result of the undetermined rights of several thousand wells in those areas used independently or in conjunction with surface decrees, these rules and regulations will be implemented there and within other drainage basins only where applicable.

5. In administering waters of the state, the state engineer, division engineers and authorized representatives shall consider the weather conditions, present and prospective water supply conditions, records of the state engineer's

office, past experience gained in admininstering water, and any other pertinent conditions, in implementing the rules and regulations set forth herein. Pursuant to these rules and regulations there shall be no curtailment of any diversion, whether it be by surface diversion, wells, or any other means, unless such curtailment together with other curtailments shall result in a reasonable lessening of material injury to a senior appropriator requiring water in time of shortage or projected shortage.

6. All rights to divert ground water that have not been adjudicated according to Colorado law, shall be administered as if they all had the same date of priority and the same right to divert until such time as these rights have been adjudicated. The priority dates of those ground water rights which have heretofore been adjudicated shall be fully recognized; provided, however, that such adjudicated rights shall not be regulated to a greater extent than unadjudicated rights.

7. Any ground water appropriator or appropriators affected by these rules and regulations may use a part or all of the water the well or wells will produce without regard to any herein established regulation; provided, that the division engineer may approve a proposed written plan submitted by the appropriator or appropriators, whereby the amount of the depletion from the stream from said well or wells during the irrigation season will be returned to the stream by replacement or exchange from sources other than ground water at the time and in the amount that the depletion takes place, so that prior vested rights are not damaged.

8. An appropriator may elect to treat any well or wells as alternate points of diversion for part or all of any decreed surface right upon submission and approval of a written plan to the division engineer. The division engineer shall consider such plan and give his approval only upon making the determination that the rights of other appropriators will not be adversely affected by the implementation of said plan. Such an election shall preclude the appropriator from diverting from the surface diversion facility more than the amount of such surface right minus the amount he has elected to divert by such well or wells and shall permit the appropriator to divert the amount elected through such well or wells under the priority of such surface right at any time the surface right is partially or fully available in the surface stream. If such surface right is not

available in the surface stream, or if the appropriator has not elected to treat the well or wells as an alternate point of diversion, he may pump only at times wells within the same zone are permitted to pump under these regulations.

The executive officer of every ditch company, reservoir company, corporation or any other interested person holding a judicial decree on the diversion of water from any stream for direct flow irrigation desirous of implementing this rule shall file in the office of the division engineer, as part of the written plans, a statement designating the well or wells to be used in conjunction with said decreed priority. On Monday of each week, the executive officer or interested person, referred to above, shall report to the division engineer or his authorized representative the volume and rate of flow of water diverted by means of wells and surface diversions on a daily basis so that it can be determined that the appropriator is complying with the terms of said plan.

9. Attached to these rules and regulations there shall be kept on file in the office of the state engineer and division engineers of Irrigation Division Nos. 1 and 2, Exhibits "A" and "B", maps of the South Platte and Arkansas Rivers, respectively, and major tributaries, zoned according to the time a well will cause an initial affect on the stream flow. Initial affect shall be defined as that affect which equals 5% of the consumptive use of water appropriated by the well.

The portion of the water course affected by these rules and regulations shall be divided into the following three zones:

a. *Zone A:* That area in which the time of initial affect occurs from 0 to 10 days after appropriation commences depending upon the location of the well within the zone. Wells in Zone A shall be regulated from the date of a written demand of a senior appropriator who because of his date of priority could be totally or partially supplied from surface flows until October 10, 1969.

b. *Zone B:* That area in which the time of initial affect occurs from 10 to 30 days after appropriation commences depending upon the location of the well within the zone. Wells in Zone B shall be regulated from the date of a written demand of a senior appropriator who because of his date of priority could be totally or partially supplied from surface flows until September 25, 1969.

c. *Zone C:* That area in which the time of initial affect occurs from 30 to 75 days after the appropriation com-

mences depending upon the location of the well within the zone. Wells in Zone C shall be regulated from the date of a written demand of a senior appropriator who because of his date of priority could be totally or partially supplied from surface flows until September 1, 1969.

Because of the extremely narrow alluvium deposits on some tributaries, all wells in the alluvium deposits of tributary streams not specifically zoned in Exhibits "A" and "B" will be administered on the same basis as wells in Zone A.

The state engineer and the respective division engineer shall estimate the amount of the shortage resulting to surface appropriators from well operations. Unadjudicated ground water appropriations being regulated at any particular time will be on a basis not to exceed three (3) days per week. The division engineer shall administer this rule so that the operator of the well or wells may have a cycle of operation to make most efficient use of the water available; provided, that other appropriators are not adversely affected.

The effective date of these Rules and Regulations will be the 8th day of August, 1969.

/s/ *C. J. Kuiper*
C. J. Kuiper
State Engineer