MR. JUSTICE GROVES
delivered the opinion of the Court.
Acting under section 37-92-501, C.R.S. 1973[1] and effective as of February 19, 1973, the State Engineer of Colorado adopted rules (here called the 1973 Rules) governing the use of ground water in the Arkansas River Basin. No protests to these rules were made. The 1973 Rules curtailed well diversions for no more than four days per week.
*559 On January 4, 1974 the State Engineer proposed an amended Rule 3 of the 1973 Rules (here called the Amendment) to be effective March 27, 1974.[2] The Amendment provided for curtailment of five days per week during 1974, six days during 1975, and total curtailment during 1976. Prior to the effective date of the Amendment, the protestants filed separate protests with the water court. These were consolidated for trial. The water court decreed that the Amendment be disapproved and that the existing 1973 Rules continue in effect without amendment. The State Engineer appealed. We affirm the result.
The Arkansas River Basin contains surface and sub-surface water flows of the Arkansas River and its tributaries. Some description of the flow of the surface stream and the adjoining and underlying alluvial aquifer is contained in Fellhauer v. People, 167 Colo. 320, 447 P.2d 986 (1968). The surface and alluvial flows are interconnected, and withdrawal of water from one affects the flow in the other.
Decreed diversions of the surface flow caused the basin to become overappropriated many years ago. Prior to 1950 comparatively few wells tapped the underground aquifer. In 1972 there were over 1700 wells having a capacity of more than 100 gallons per minute. These wells, according to some computations, pumped more than 200,000 acre feet of ground water during 1972.
Fellhauer v. People, supra, arose when in 1966 the division water engineer attempted to shut down 39 of the hundreds of wells then operating; and the People commenced a proceeding to enjoin Fellhauer from pumping water from his well. An injunction was issued, which we ruled should be dissolved. We held that, in order to control wells, rules, regulations and guidelines should be promulgated in advance of enforcement.
The General Assembly was of similar mind, as shown by its enactment within a few months after the announcement of Fellhauer of the Water Right Determination and Administration Act of 1969. Sections 37-92-101 et seq., C.R.S. 1973. This Act authorized the adoption by the State Engineer of rules and regulations in connection with the state’s policy “to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state.” Section 37-92-102(1) C.R.S. 1973. See section 37-92-501, C.R.S. 1973.
Acting under Fellhauer and the 1969 Act, the State Engineer on July 14, 1969 promulgated rules and regulations relating to ground water tributary to the South Platte River. These were to be in effect from August 8, 1969 to October 15, 1969. They divided the alluvium into three *560 zones, A, B and C. Zone A was that area in which the initial effect from well withdrawal occurred at the surface stream from zero to ten days after commencement of withdrawal. Zone B was the area in which such initial effect occurred from ten to thirty days; and Zone C that area in which the initial effect occurred from thirty to seventy-five days. The regulations provided that the Division Engineer could not “regulate” (i.e., shut-down) any well for more than three out of any seven days. Regulation of wells in Zone C was to cease September 1, 1969; in Zone B on September 25, 1969; and in Zone A on October 10, 1969.
The water court having jurisdiction ruled that the regulations were null and void in that, among other things, they were unconstitutionally unreasonable and vague, were discriminatory, arbitrary and capricious, and were contrary to law. We reversed and upheld the regulations. Kuiper v. Well Owners Conservation Association, 176 Colo. 119, 490 P.2d 268 (1971).
In the instant case, the State Engineer contends that the Amendment was proper under Kuiper v. Well Owners Conservation Association, supra. The consolidated trial of the issues raised by the several protests to the Amendment consumed fifteen days in March, May and October, 1975. The transcript of record consists of 4682 folios, plus volumes upon volumes of exhibit-studies and mountainous other exhibits. Nearly a year was consumed in the completion of the transcript of the record, preparation and submission of proposed findings, conclusions and decree, and preparation and submission of briefs. Oral arguments were made to the water court on October 28 and 29, 1976. Its Findings of Fact, Conclusion of Law and Judgment and Decree, 93 folios in length, were entered on December 1, 1976.
On the appeal here, the last brief was filed on November, 21,1977 and the case was orally argued before us on January 25, 1978. We have spent considerable time since oral argument grappling with the many issues presented to us. We have been obliged to conclude that the posture of the case and nature of the evidence are such that several of the issues presented should not be determined in this case. These determinations must await evidence of more complete hydrological research in the basin and further presentations in court.
The purpose of the State Engineer in adopting the Amendment was to protect decreed rights to surface water against encroachment by wells. This is not, however, a case in which surface appropriators generally are pitted against well owners. A substantial part of the farm ground water users also have surface water rights and they use the surface water and ground water conjunctively for irrigation.
One study admitted in evidence states that there are annually a total of 4,200,000 acre-feet of surface water rights in the basin with only an average annual surface supply of 700,000 acre-feet. As mentioned, there *561 is in evidence that in 1972 there were withdrawals of over 200,000 acre-feet from wells. The court made a finding that an estimated 2,000,000 acre-feet of water is generally held in transient storage within the alluvial material in the basin.
When water in the aquifer is brought to the surface by a well and there is a consumptive use of that water by evaporation and evapotranspiration of phreatophytes, generally the surface supply is depleted by the amount of such consumptive use. The evidence and findings in this case demonstrate, however, that the restriction of wells does not necessarily result in a comparable increase in the supply of surface water. There are countereffects which offset or modify the depletive use of well water. Some of these are: variations in the amount of river flow; winter irrigation; reduction in evaporation and phreatophyte losses as a result of lowering of water tables; changes in ground water storage; extent of alluvium recharge occuring during wet cycles or as a result of widespread winter irrigation practices; and increased irrigation efficiencies. Other factors which may also be involved are increased ground water storage, stock ponds, municipal sewage lagoons, potholes, changes in side channel inflows, and cyclical fluctuations through wet and dry periods.
I.
Prior to the adoption of the 1973 Rules, there had been virtually no regulation of wells in the basin, and consequently no empirical data as to the effect upon surface rights in the basin of regulation of wells.
The 1973 Rules, which became effective on February 19,1973, in effect provided that there should be curtailment of well diversions for not more than 4 days per week when and as necessary to prevent material injury to senior appropriators. Then, on January 4, 1974 the State Engineer announced the Amendment, effective March 27, 1974. This required a complete shut-down of wells by 1976 unless they were operated as alternate points of diversion for surface rights in priority or were embraced within augmentation plans approved by the State Engineer.
At the inception of the hearing, counsel for the protestants Atchison, Topeka and Santa Fe Railway Company mentioned that the Company owns two wells at its rail yards in LaJunta, which wells have an adjudicated priority date of February 1907. An attorney for the State Engineer then assured counsel that “when your water rights are in priority or any other water rights are in priority within the administration of the Arkansas River . . . they are going to be recognized.” The attorney further assured counsel for the Company that something to this effect would be placed in the conclusions of law and the decree of the case. The proposal of the State Engineer for findings of fact, conclusions of law and decree (which were not followed by the water court) contained the following:
“Ground water diversions shall be continuously curtailed . . . unless . . . the Division Engineer shall find . . . that the ground water appropria *562 tion can be operated under its priority without impairing the water supply to which a senior appropriator is entitled . . .
We note at the outset that this recognition of adjudicated well priorities is not to be found — at least expressly — in the 1973 Rules or in the Amendment.
Also at the outset it is to be noted that the Amendment is far different from the regulations which we approved in Kuiper v. Well Owners Conservation Association, supra.
Among many other findings and conclusions, the water court in effect found that the State Engineer was in error in adopting the Amendment because it was not promulgated on the basis of investigations and experience under the 1973 Rules; and that the promulgation of the Amendment was contrary to provisions of the statute. We approve of these rulings.
The court stated:
“There is no evidence that the Amendment was required to prevent material injury to vested senior rights at the time of a senior need. The State Engineer promulgated the Amendment, according to his testimony, partly on the basis of his experience on the Platte River, but not on the basis of his experience on the Arkansas River under the 1973 Rules. No data on operating experience under the 1973 Rules was introduced into evidence and, according to the testimony of the State Engineer, none exists in fact.”
The 1973 Rules caused a pronounced change in the operation of wells. The Amendment was issued when the time for a protest to the 1973 Rules had expired, but when there had been no evaluation of operating experience under the 1973 regulations. The Amendment made a drastic change. Under the circumstances its promulgation was in conflict with the legislative policy that
“ground water diversions shall not be curtailed nor required to replace water withdrawn, for the benefit of surface right priorities, even though such surface right priorities be senior in priority date, when, assuming the absence of ground water withdrawal by junior priorities, water would not have been available for diversion by such surface right under the priority system.” Section 37-92-501(1), C.R.S. 1973.
There was a duty upon the State Engineer, before adopting the Amendment, to determine that it would make additional water available for senior priorities. This he did not and could not do because he did not yet know the effect resulting from the 1973 Rules.
The State Engineer further violated the statutory provisions which read:
“Rules and regulations may be amended or changed from time to time within the same aquifer dependent upon the then existing and forecast conditions, facts and conditions as then known, and as knowledge of the aquifer is enlarged by operating experience.” Subsection 37-92-501 (2)(f), *563 C.R.S. 1973.
When the Amendment was promulgated, there was no knowledge of the “then existing” conditions under the 1973 Rules and there had been no enlargement of knowledge “by operating experience.”
II.
We neither approve or disapprove the several other findings and conclusions of the water court which it believed supported its ruling that the Amendment was invalid. Our holding above is the basis for our affirmance of that court’s decree. We do feel that it is incumbent upon us, however, to comment on two further matters.
III.
One of the conclusions of law of the water court reads as follows:
“The burden of proof is on the State Engineer, by reason of C.R.S. 1973, 37-92-501(2)(h) (L. 1971), 37-92-304(3) and 24-4-105, to support the Amendment by clear and convincing evidence.”
We note in passing that this was taken verbatim from the proposed findings, conclusions and decree submitted by the protestants Colorado Water Protective and Development Association and Security Water District.
Assuming that the State Engineer has the burden of proof in this proceeding, that burden is at most to support the Amendment by a proponderance of the evidence, not by “clear and convincing evidence.” See Kuiper v. Well Owners Conservation Association, supra. The error of the water court in the use of the term “clear and convincing evidence” is not prejudicial for the reasons already stated. Viewing the State Engineer’s evidence in the most favorable light, the Amendment cannot stand because it did not rest upon knowledge of operating experience in the basin and evaluation of operations under the 1973 Rules.
IV.
When the Special Assistant Attorney General concluded his oral rebuttal argument to us he stated substantially the following: In your decision we earnestly hope that, in any event, you do not uphold the water court in its ruling relating to the statute which refers to water used for 18 years.
In making this statement counsel was referring to the following portion of the conclusions of law and of the decree entered by the water court:
“The Amendment is contrary to the provisions of C.R.S. 1973, 37-92-401(1) (b) (VI) to the extent that it alters the priority of water rights that have been lawfully enjoyed for a period in excess of 18 years.”
“[T]hat wells that have been operating for more than 18 years without curtailment be exempted from regulation to the extent of their unrestrained historic usage pursuant to C.R.S. 1973, 37-92-401 (b) (VI).”
Section 37-92-401 (l)(b)(VI), C.R.S. 1973 reads:
*564 “If the preceding principles would cause in any particular case a substantial change in the priority of a particular water right to the extent theretofore lawfully enjoyed for a period of not less than 18 years, then the division engineer shall designate the priority of that water right in accordance with historic practice.”
Earlier in section 401 it was provided that no later than July 1, 1970 the division engineer of each division should prepare a tabulation, in order of seniority, of all decreed water rights and conditional water rights in his division. As to determination of the priority of a water right in relation to other water rights deriving their supply from the same common source, section 401 continued with the following, which are the paraphrased “preceding principles” mentioned above in subsection (b)(VI):
“A common source means waters, either surface or underground, which if left in their natural state would join together to form a single natural water course.
“The historic date of initiation of appropriations shall determine the relative priorities, begining with the earliest right.
“As among water rights decreed in different adjudication suits, all water rights decreed in one suit shall be senior to all decrees in any subsequent suit.
“As among rights decreed in various water districts of the same water division, the date of initiation of appropriation shall determine the relative priorities in numbered sequence, begining with the earliest right.
“In supplemental adjudications, the priority date of any decree shall not extend back further than the day following the entry of the final decree in the preceding adjudication.”
Then follows the subsection (b)(VI) quoted above and which caused the court to hold that the Amendment violated this subsection in that it altered the priority of rights lawfully enjoyed for a period in excess of 18 years, and caused the court to order that wells that had been operating for more than 18 years without curtailment were exempted from regulation under the Amendment to the extent of their unrestrained historic usage.
The State Engineer is of the belief that by this portion of the decree wells are not given their true date of priority, “but [are given] the best water right on the entire stream, thereby destroying water rights that have been in existence for well over 100 years.” The protestant association and protestant water district assert that subsection 401(b) (VI) applies to and affords protection for, not only the so-called 1970 tabulated decrees under *565 section 37-92-401, but to and for wells given decreed priority dates pursuant to section 37-92-306, C.R.S. 1973.[3]
It appears that the intent of the water court in the last quoted portion of the decree may have been to apply the subsection (b)(VI) exemption to the 1973 Rules, as well as the Amendment. In any event, this case concerns only the Amendment. Irrespective of what subsection (b)(VI) means and of what the water court intended in its decree, any effect of subsection (b)(VI) upon the Amendment is moot as we have affirmed the nullification of the Amendment for other reasons as stated earlier in this opinion. Therefore, we neither approve nor disapprove of the water court’s statements concerning application of subsection (b) (VI). Our exposition on this subject is for the following reason: Undoubtedly, our water courts are now faced, and they and we will be faced with the interpretation of subsection (b)(VI). We can see some merit in an argument that it appears to be out of context with the rest of the Water Right Determination and Administration Act of 1969.
We have not yet made a determination of the meaning of, and the legislative intent behind, subsection (b)(VI). The General Assembly may wish to consider the arguments concerning the meaning and effect of this subsection contained in the briefs on file with this court, and may wish to consider official elucidation of the meaning and legislative intent. This, of course, is entirely within the discretion of the General Assembly. Absent legislative clarification, in a proper case we will make our determination of legislative intent and effect; and, obviously, prior thereto the water courts have the same privilege.
Except as already approved in this opinion, we neither approve nor disapprove of the findings of fact, conclusions of law and decree entered by the water court. Our affirmance here is predicated solely on the reasons which we have previously expressed.
Judgment affirmed.

 The citation then was C.R.S. 1963, 148-21-34.

 The division engineer joined in the Amendment.

 “With respect to each [water division], the priority date awarded for water rights or conditional water rights adjudged and decreed on applications for a determination of the amount and priority thereof filed in such division during each calendar year shall establish the relative priority among other water rights or conditional water rights awarded on such applications filed in that calendar year; but such water rights or conditional water rights shall be junior to all water rights or conditional water rights awarded on such applications filed in any previous calendar year and shall also be junior to all priorities awarded in decrees entered prior to June 7, 1969, or decrees entered in proceedings which were pending on such date; except that, with respect to water rights which are diverted by means of wells, the priorities for which have not been established or sought in any such decree or proceeding, if the person claiming such a water right files an application for determination of water right and priority not later than July 1, 1972, and such application is approved and confirmed, such water right, subject to the provisions of section 37-92-305(1), shall be given a priority date as of the date of actual appropriation and shall not be junior to other priorities by reason of the foregoing provision.”